693 S.E.2d 919

**Kent BLACKBURN and Alison R. Minnich, Petitioners,**

**v.**

**TKT AND ASSOCIATES, INC., Martha C. Carver, and Raymond T. Windham, Respondents.**

and

**TKT and Associates, Inc., Martha C. Carver, and Raymond T. Windham, Defendants/Cross–Claimants,**

**v.**

**Palmetto Medical Equipment of Florence, LLC and Palmetto Medical Equipment, Inc., Third Party Defendants.**

No. 26822.

Supreme Court of South Carolina.

Heard April 21, 2010.

Decided May 24, 2010.

Louis D. Nettles, of Folkens & Jernigan, of Florence, for Petitioners.

J. Rene Josey and C. Pierce Campbell, both of Turner, Padget, Graham & Laney, of Florence, for Respondents.

Justice PLEICONES.

Two shareholders in a corporation sued for dissolution and damages based on their belief that two other shareholders were draining profits by taking excessive salaries from the corporation. The trial judge found in favor of the plaintiff shareholders and, rather than order dissolution, ordered the defendant shareholders to buy the shares of the plaintiff shareholders. An appraisal was conducted pursuant to the trial court's order but, in valuing the future earnings of the corporation, the appraisal included the salaries that the trial judge found improper, thereby lessening the value of the corporation. The plaintiff shareholders moved before a different judge to vacate the appraisal, but their motion was denied and the Court of Appeals affirmed. See *Blackburn v. TKT and Assoc., Inc.,* 382 S.C. 71, 675 S.E.2d 448 (Ct.App.2009). This Court granted certiorari. We now reverse the decision of the Court of Appeals and remand to the circuit court.

## FACTS

In late 2002, Kent Blackburn, Tina Carver, and Raymond Windham formed a corporation, operating as the Carolina Mobility Center (Carolina Mobility), to sell durable medical equipment. The newly formed company borrowed $50,000 for capital and each of the three members signed on the note. In early 2003, the shareholders agreed to hire Alison Minnich as an employee, at a salary of $34,000.[1] In addition, Minnich received a 10% stake in the company. Blackburn, Carver, and Windham each held a 30% stake.

In 2004, in addition to paying Minnich's salary, Carolina Mobility paid salaries to Carver and Windham of nearly $34,000 each. Carver and Windham received salaries of $13,333.33 each in 2005. The shareholders also received disbursements in accordance with their stakes in the company. Carver was responsible for signing checks on behalf of the corporation.

A dispute developed among the members of the corporation and Blackburn and Minnich (collectively "Petitioners") filed suit alleging that, as Carolina Mobility became profitable, Carver and Windham (collectively "Respondents") began paying themselves from the corporate funds, amounts disguised as salaries for minimal or non-existent contributions to the corporation. As a result, Petitioners alleged that Respondents lessened the value of Petitioners' ownership interest in Carolina Mobility. Petitioners asked that the corporation be dissolved and that the Respondents be required to pay Petitioners the lost value of their stock.

After a bench trial, Judge Thomas Russo issued an order (Judge Russo's Order) finding in favor of Petitioners. Judge Russo found that the Respondents "have engaged in a pattern of improperly draining the assets of the corporation through claims of services as employees of the corporation, and have improperly represented to the other shareholders their activities on behalf of the corporation." Specifically, Judge Russo found that Respondents "paid Minnich her salary and then split the rest of the earnings as individual salaries instead of profit, thus devaluing the corporation." Rather than dissolve

---

1. Carver testified that Minnich's salary was $31,200.

the corporation as Petitioners requested, Judge Russo elected to require Respondents to purchase Petitioners' shares at Fair Market Value.[2] The court order concluded: "Following the appraisal, [Petitioners] should be paid in accordance with their percentage of the corporation's shares." No party filed a Motion for Reconsideration.

In accordance with the trial court's order, the parties agreed on an appraiser (Appraiser). The parties also agreed on a valuation method, choosing the "income approach." In the Appraiser Report (Report), Appraiser valued the total shares in Carolina Mobility at $34,300. Petitioners filed objections to the Report on the ground that it did not account for the corporation's loss in value due to Respondents' improper actions. Petitioners moved that the Report be vacated and that Appraiser be instructed to value the corporation only after "normalizing the earnings of the corporation in a manner consistent with [Judge Russo's order]." Respondents filed a motion to enforce the judgment in accordance with the Report.

A hearing was held before Judge Michael Nettles on the motions. Judge Nettles issued an order (Judge Nettles's Order) granting Respondents' motion to enforce the judgment and ordering payment to Petitioners in accordance with their percentage shares. Petitioners appealed and the Court of Appeals affirmed. This Court granted certiorari to review the decision of the Court of Appeals.

## ISSUE

Did the Court of Appeals err in upholding the trial court's decision denying Petitioners' Motion to Vacate the Report?

## DISCUSSION

### A. Terms of the Appraisal

Petitioners' contend that the Appraiser failed to conform to the agreed-upon guidelines in conducting the appraisal. We agree with Petitioners that by failing to make "normalization

---

2. Though S.C.Code Ann. § 33–14–300 allows a court to dissolve a corporation, S.C.Code Ann. § 33–14–310(d) allows the court to instead order other relief, including providing for the purchase at their fair value of shares of any shareholder.

adjustments," the Appraiser did not comply with the "income approach," and the Appraisal should be vacated.

As noted, in his order, Judge Russo required the parties to agree on an impartial corporate appraiser to compute the corporation's value. The parties did so. In an Engagement Letter to Respondents' attorney, Appraiser outlined the "terms and objectives" of the valuation. Under the terms of the letter, Respondents acknowledged that Appraiser's "services and work product" would be subject to the terms of the letter, including the attached "Exhibit 1." Exhibit 1 provided that the analysis would be done in accordance with the Statement of Standards for Valuation Services of the American Institute of Certified Public Accountants (AICPA) and National Association of Certified Valuation Analysts (NACVA).

## B. The Income Approach

The parties also agreed on a method for valuating the corporation, selecting the "income approach" from three option s.[3] The "income approach" or "investment value" approach[4] is a method for ascertaining the present value of a corporation's expected future earnings. *See* 14 Business Organizations with Tax Planning § 186.05[2] (Matthew Bender) (2010). "This figure is obtained by multiplying a recent year's financial performance or an average of recent years' performances by a capitalization ratio selected to reflect the corporation's future prospects." *Id.*

## C. Normalization

Petitioners complain that Appraiser omitted a key step in conducting the "income approach" valuation—normalization. The standards of the AICPA[5], by which Appraiser agreed to

---

**3.** Counsel for Petitioners explained that there are three methods for valuating a corporation: (1) the asset method; (2) the fair market value method; and (3) the income approach.

**4.** *See Quill v. Cathedral Corp.*, 215 A.D.2d 960, 627 N.Y.S.2d 157, 159 (1995) (recognizing that the "investment value" approach is also referred to as the "income approach").

**5.** The AICPA Standards were not issued until June 2007 and were not effective until January 2008. Nonetheless, the Standards were avail-

conduct the valuation, require that in conducting the "income approach," the appraiser must consider "normalization adjustments."[6] Statement on Standards for Valuation Services: Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset § 33 (Am. Inst. of Certified Pub. Accountants 2007) [hereinafter "AICPA Standards"][7]. The AICPA Standards define "Normalized Earnings"[8] as "economic benefits adjusted for nonrecurring, noneconomic, or other unusual items to eliminate anomalies and/or facilitate comparisons."

Additionally, the NACVA Standards provide that "historical financial statements should be analyzed and, if appropriate, adjusted to reflect the appropriate asset value, income, cash flows and/or benefit stream, as applicable, to be consistent with the valuation method(s) selected by the member." Professional Standards, § 3.9 (Nat'l Ass'n of Certified Valuation Analysts 2002) [hereinafter "NACVA Standards"].[9]

In conducting the valuation, Appraiser e-mailed attorneys for Petitioners and Respondents and asked them to comment on salaries paid to the shareholders from 2003–2005 and to state a reasonable compensation for that period. Counsel for Respondents replied as follows:

My clients' position is that the salaries they received were consistent with their contribution to the company. We have maintained this position prior to and at the trial of this matter. With that said, the judge states in his order that our salaries were in excess of the contributions. However, he does not state how excessive. I would suggest reviewing

able in draft form in 2006 and the Engagement Letter stipulated that they would be used in the valuation.

6. As Judge Nettles noted that Petitioners were "protected on the record," we find the AICPA Standards are properly before us.

7. The AICPA Standards are available on the AICPA website at: http://fvs.aicpa.org/NR/rdonlyres/672E1DD4–2304–47CA–8F34–8C5AA64CB008/0/SSVS_Full_Version.pdf.

8. The glossary definition of "Normalization" within the AICPA Standards provides "see Normalized Earnings."

9. The NACVA Standards are available on the NACVA website at: http://nacva.com/association/A_pro_stand.asp.

the briefs submitted by the two parties on this issue. I believe we both made arguments therein.

Unless Louis is willing to suggest an amount, it may be most helpful for you all to determine what you think may have been appropriate for each person and then see if we can agree to that number.

Counsel for Petitioners responded as follows:

You have hit on the heart of the issue that was before the court. The Plaintiffs contended that the payments to Carver and Windham were not for services rendered to the Corporation but rather were simply a looting of the corporate profits. The testimony before the court was that Carver and Windham were not working for Carolina Mobility but rather were spending their time in their other businesses. Carver did do some administrative work for Carolina Mobility, primarily paying the bills as she controlled the company checkbook. The work Carver did was part time administrative work which required only a low skill level. Carver and Windham both claimed to be full time employees of Carolina Mobility (TKT) b[ut] the Court ruled otherwise. I would refer you to the [sic] Judge Russo's order.... You should follow Judge Russo's order and while it might be proper to assign some value to Carver's services[,] the vast majority of the payment[s] to Blackburn,[10] Carver and Windham should be reversed to properly normalize the corporation[']s income.

Despite the e-mail exchange with the attorneys, in the final valuation, Appraiser made no adjustment for the salaries. On Exhibit 2 of the valuation, the entries for "Normalizing Adjustments" were filled only with a dash. Appraiser valued the corporation at $34,300 based on the corporation's performance from 2003–2005.

### D. Conclusion

By failing to make normalizing adjustments, Appraiser did not abide by the agreed-upon method in conducting the valuation. Respondents' excessive salaries constituted unusual ex-

---

10. It is unclear why Petitioners' counsel asks that payments to Blackburn be reversed. Blackburn did not receive a salary and was only paid when distributions were made to the other majority shareholders.

penses which should have been removed in order to appropriately value the corporation. Moreover, Appraiser's failure to normalize contradicted Judge Russo's order. As noted, the "income approach" provides a method of ascertaining the present value of a corporation's expected future earnings. By failing to make adjustments, Appraiser effectively rewarded Respondents for their misconduct by factoring their unmerited salaries into calculating the corporation's future value.

We disagree with the conclusion of the Court of Appeals that "no evidence or information was proferred" to Judge Nettles "showing the report was prepared improperly." Judge Nettles had before him the Report, which showed that the entries for "Normalizing Adjustments" were left blank. Moreover, Petitioners argued that the Report was deficient in that it contained no normalizing adjustments and offered AICPA Standards, which Judge Nettles declined to consider. At a minimum, Petitioners showed Respondents' salaries were excessive and some normalization adjustment was required.[11] Accordingly, the appraisal must be vacated and the Court of Appeals erred in upholding the trial court's refusal to do so.[12]

## CONCLUSION

We find Appraiser violated the agreed-upon method in making the final valuation. Because the Report did not make any allowance for Respondent's excessive salaries, it failed to comply with the "income approach" by failing to "normalize" earnings of the corporation. Consequently, we reverse the

---

11. Respondents argue in support of the Court of Appeals opinion that Petitioners have not quantified the damages they seek to collect as they failed to offer evidence of the amount of salary reduction. We note that, in the email response to Appraiser, Petitioners' counsel allowed that Appraiser "might" choose to value Carver's services, but made clear that Petitioners' position was that a $0 value was warranted under the facts as found by Judge Russo. Consequently, in our view, the burden of producing evidence setting a value on Respondents' services rested equally, if not entirely, with Respondents.

12. It is possible that Appraiser did consider normalization but did not make normalizing adjustments because it considered Respondents' salaries appropriate. However, such a finding would directly contradict the findings of fact of Judge Russo, who found that the salaries were excessive. This position would also require that the appraisal be vacated.

decision of the Court of Appeals and remand the matter to the circuit court which should instruct Appraiser to conduct a new appraisal consonant with Judge Russo's order.

TOAL, C.J., BEATTY, KITTREDGE, JJ., and Acting Justice JAMES E. MOORE, concur.