2011 UT App 113

**Jack W. PETERSON, Plaintiff, Appellee, and Cross-appellant,**

v.

**D. Scott JACKSON; Alan D. Allred; and Peterson Allred Jackson, P.C., Defendants, Appellants, and Cross-appellees.**

**No. 20090710–CA.**

Court of Appeals of Utah.

April 14, 2011.

1098

James C. Jenkins and Jeremy S. Raymond, Logan, for Appellee and Cross-appellant.

Mark B. Hancey, Providence; and Gary N. Anderson and Brian G. Cannell, Logan, for Appellants and Cross-appellees.

Before Judges McHUGH, VOROS, and ROTH.

## OPINION

VOROS, Judge:

¶ 1 This case involves the valuation of a public accounting firm for purposes of a purchase in lieu of dissolution. The departing shareholder's shares were valued at $505,625 by his expert and at $224,639 by the remaining shareholders' expert. The trial court determined a "fair value" of $459,000. Both sides appeal. We affirm.

## BACKGROUND

¶ 2 Jack W. Peterson, Alan D. Allred, and D. Scott Jackson were the sole shareholders in Peterson Allred Jackson, a certified public accounting firm ("the Company"). Peterson and Allred founded the firm in 1984. In 2001, Jackson, who was working at the CPA firm of Jackson Downs, joined the firm. Peterson owned 36.37% of the shares of the Company; Allred and Jackson owned the remainder.

¶ 3 In 2006, conflicts developed among the partners about the management of the firm. Ultimately, Peterson alleged that Allred and Jackson attempted to "freeze out, terminate, and destroy [Peterson's] equity, employment, management, and investment expectation." Peterson filed for dissolution. Allred and Jackson individually and on behalf of the Company (collectively, "PAJ") elected to purchase Peterson's shares in lieu of dissolution under Utah Code Ann. § 16–10a–1434 (Supp. 2010).

¶ 4 Because the parties could not reach an agreement on fair value, the case went to trial. The trial court was thus required to "determine the fair value of the petitioning shareholder's shares ... as of any ... date the court determines to be appropriate." *Id.* The parties and the trial court agreed that the date for establishing fair value of Peterson's shares would be December 31, 2006. To determine fair value, Peterson and PAJ each retained experts. Peterson retained Brad Townsend; PAJ retained Tyler Bowles. Each expert considered the fair value of the Company under three valuation approaches: the income approach, the market approach, and the asset approach.[1] Townsend also used rules-of-thumb approaches "developed by observing the actual transaction price as a multiple of financial indicators such as net revenue, earnings, and cash flow."

¶ 5 Townsend subdivided the income approach into the capitalized net income approach, under which he concluded the fair value of the Company was $724,366, and the capitalized cash flow approach, under which he concluded the fair value of the Company was $744,409. Townsend determined that, under the market and rules-of-thumb approaches, the fair value of the Company was between $1,098,094 and $1,963,581. And Townsend determined that under the asset approach, the fair value of the Company was $375,019. Townsend then weighted these various approaches. He accorded 20% weight to the capitalized net income approach, 20% to the capitalized cash flow approach, 60% to the market and rules-of-

---

1. The income approach, sometimes identified with "investment value," see, e.g., *Hogle v. Zinetics Med. Inc.*, 2002 UT 121, ¶¶ 32–33, 63 P.3d 80; *Blackburn v. TKT & Assoc.*, 387 S.C. 589, 693 S.E.2d 919, 921 (2010), "represents an estimate of the corporation's earning capacity," *Oakridge Energy v. Clifton*, 937 P.2d 130, 133 (Utah 1997); the "market value" considers the "market price of the stock," *id.* at 132; and "asset value" refers to the " 'net asset value,' " *id.* at 133 (quoting *In re Valuation of Common Stock of Libby, McNeill & Libby*, 406 A.2d 54, 66 (Me.1979)).

thumb approaches, and 0% to the asset approach. Using this weighting, Townsend concluded that the Company's fair value was $1,263,086. Townsend thus valued Peterson's 36.37% share at $459,000. Townsend also concluded that, as of December 31, 2006, the Company held $128,196 in undistributed cash and that Peterson's share of that cash was $46,625. Thus, Townsend ultimately valued Peterson's share of the Company at $505,625.

¶ 6 Bowles used the same general valuation approaches, but adjusted each calculation for personal goodwill. Bowles determined that the fair value of the Company under the income approach was $581,084, under the market approach was $712,556, and under the asset approach was $617,649. Bowles then determined that the asset approach was the "most applicable method." Accordingly, he valued Peterson's 36.37% share of the Company at $224,639.

¶ 7 At trial, the court also heard evidence concerning the 2001 transaction in which Jackson became a shareholder in the Company. Jackson's former firm, Jackson Downs, merged with the Company. Jackson "bought in" to the Company by executing three non-interest-bearing promissory notes. Jackson's buy-in price was calculated using a formula based on gross sales and percentage of stock. Applying the same formula to Peterson's shares in the Company in 2006 yielded a value of $517,763.17.

¶ 8 The trial court issued a thirteen-page memorandum decision on April 17, 2009 (the April 17 Memorandum Decision). In it, the trial court adopted Townsend's valuation:

> The Court heard two very different opinions ... from two very qualified individuals. Yet, in the end there was over a 50% difference in value between the two. The natural inclination is to take a Solomon approach and split the difference. However, the Court has not done this. To do so would negate both expert opinions and require the Court to pick a number out of thin air.

The trial court noted that, under Utah case law, "the three most recognized and relevant elements of fair value for stock valuation purposes are asset value, market value, and investment value," see Hogle v. Zinetics Med., Inc., 2002 UT 121, ¶ 18, 63 P.3d 80; that, of these, the investment value has been traditionally favored, see Oakridge Energy, Inc. v. Clifton, 937 P.2d 130, 133 (Utah 1997); and that, unless the company is being liquidated, the asset approach " 'is the least reliable,' " see Bingham Consolidation Co. v. Groesbeck, 2004 UT App 434, ¶ 19, 105 P.3d 365 (quoting Oakridge, 937 P.2d at 133). The trial court thus rejected Bowles's valuation, which was based solely on the asset approach.

¶ 9 The trial court then turned to Townsend's report. The court noted that Townsend considered all three valuation techniques recognized in case law and that the report "offer[ed] a reasonable and educated explanation for making the assumptions [it] did." The court also commented on the Jackson buy-in formula and the $517,763.17 valuation it yielded. The court stated that while this number "did not provide definitive valuation guidance," the court would use it "as a guidepost in its decision." The trial court concluded that the value of Peterson's share of the Company was $459,000. This was Townsend's estimate, excluding any portion of the Company's undistributed cash. The trial court did not award Peterson any of the undistributed cash. Despite accepting Townsend's report on valuation, the trial court concluded that it "could not find [or] determine what [Townsend's] subsequent value would be had the excess cash been included and the Court was not willing to speculate." The trial court entered judgment on May 6, 2009 (the May 6 Judgment).

¶ 10 Both sides filed postjudgment motions. Peterson sought to correct several minor errors. PAJ sought to amend "the court's findings pertaining to the court's calculated value of [Jackson]'s 2001 buy-in and the subsequent findings that flow therefrom—most significantly the fair value of [Peterson]'s shares." PAJ also sought seven additional findings regarding valuation. The trial court issued a twelve-page amended memorandum decision on July 20, 2009 (the July 20 Memorandum Decision) and a subsequent amended Judgment on August 6, 2009 (the August 6 Judgment). The court denied

all the motions and let stand its decision that the fair value of Peterson's shares was $459,000. The court denied attorney fees, costs, and damages. PAJ appeals; Peterson cross-appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 11 PAJ first contends that the trial court's findings concerning the fair value of the Company were inadequate. "[Q]uestions about the legal adequacy of findings of fact and the legal accuracy of the trial court's statements present issues of law, which we review for correctness." *Wall v. Wall*, 2007 UT App 61, ¶ 7, 157 P.3d 341 (internal quotation marks omitted). "While the ultimate determination of fair value of stock is a question of fact, the determination of whether a given fact or circumstance is relevant to fair value under [state law] is a question of law which we review de novo." *Hogle v. Zinetics Med., Inc.*, 2002 UT 121, ¶ 10, 63 P.3d 80 (alteration in original) (internal quotation marks omitted). Further, "choice of valuation methods is a question of law." *Id.* ¶ 19.

¶ 12 PAJ next contends that the trial court erred by including each shareholder's personal goodwill in reaching its fair value determination. As with the previous issue, "the determination of whether a given fact or circumstance is relevant to fair value under [state law] is a question of law which we review de novo." *Id.* ¶ 10 (alteration in original) (internal quotation marks omitted).

¶ 13 Finally, PAJ contends that the trial court made a mathematical error when it relied on an incorrect calculation of Jackson's buy-in price. PAJ asks us to order the trial court to correct this determination as a clerical error under rule 60(a) of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 60(a). "[T]he interpretation of a rule of procedure is a question of law that we review for correctness." *Brown v. Glover*, 2000 UT 89, ¶ 15, 16 P.3d 540.

¶ 14 On cross-appeal, Peterson contends that the trial court erred by failing to award Peterson 36.37% of the "excess cash" on hand on December 31, 2006. "Findings of fact ... shall not be set aside unless clearly erroneous." Utah R. Civ. P. 52(a); *see also Lefavi v. Bertoch*, 2000 UT App 5, ¶ 16, 994 P.2d 817.

¶ 15 Peterson next contends that the trial court erred in not awarding him prejudgment interest at the statutory rate of ten percent per year. Generally, "[t]he trial court's award of prejudgment interest, and the amount thereof, present[ ] a question of law which we review for correctness." *Kealamakia, Inc. v. Kealamakia*, 2009 UT App 148, ¶ 4, 213 P.3d 13 (second alteration in original) (internal quotation marks omitted). However, here, the award of interest and the amount thereof is controlled by Utah Code section 16–10a–1434(5)(c), which expressly grants discretion to the trial court in awarding interest: "Interest *may* be allowed at the rate and from the date determined by the court to be equitable." Utah Code Ann. § 16–10a–1434(5)(c) (Supp.2010) (emphasis added). We therefore review this issue for abuse of discretion.

¶ 16 Finally, Peterson contends that the trial court erred in denying his motion for costs and attorney fees. Generally, "whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Kealamakia*, 2009 UT App 148, ¶ 3, 213 P.3d 13 (internal quotation marks omitted). However, here, attorney fees are awarded under Utah Code section 16–10a–1434(5)(d), which expressly grants discretion to the trial court in awarding fees: "If the court finds that the petitioning shareholder had probable grounds for relief ... it *may* award ... reasonable fees and expenses of counsel and experts." Utah Code Ann. § 16–10a–1434(5)(d) (emphasis added). We therefore review this issue for abuse of discretion.

## ANALYSIS

I. Issues Raised by the Main Appeal

¶ 17 Corporate dissolutions are governed by Part 14 of the Utah Revised Business Corporation Act ("the Act"). *See* Utah Code Ann. §§ 16–10a–1401 to –1440 (2009 & Supp. 2010). If a shareholder petitions for dissolution, one or more shareholders may elect to purchase all shares owned by the petitioning

shareholder "at the fair value of the shares." *See* Utah Code Ann. § 16–10a–1434(1) (Supp. 2010). If the parties are unable to agree on the value of the shares, "the court shall ... determine the fair value of the petitioning shareholder's shares ... based on the factors the court determines to be appropriate." *See id.* § 16–10a–1434(4).

¶ 18 "[T]he three most recognized and relevant elements of fair value for stock valuation purposes are asset value, market value, and investment value." *Hogle v. Zinetics Med., Inc.,* 2002 UT 121, ¶ 18, 63 P.3d 80. "[A]ll three components of fair value may not influence the result in every valuation proceeding, yet all three should be considered." *Oakridge Energy, Inc. v. Clifton,* 937 P.2d 130, 135 (Utah 1997) (internal quotation marks omitted); *but see Hogle,* 2002 UT 121, ¶ 22, 63 P.3d 80 (stating that the *Oakridge* trial court did not err in not considering asset value where the business was a going concern with no prospect of liquidation and the parties had adduced no evidence of asset value).

¶ 19 However, the value of a corporation's assets is generally "the least reliable of the three factors in value determination" because it provides "little indication of what people will pay for the shares." *Oakridge,* 937 P.2d at 133 (internal quotation marks omitted). "Thus, asset value is usually not reliable unless the corporation is being liquidated." *Bingham Consolidation Co. v. Groesbeck,* 2004 UT App 434, ¶ 19, 105 P.3d 365 (citing *Hogle,* 2002 UT 121, ¶¶ 20–21, 63 P.3d 80).

¶ 20 "[C]ourts have traditionally favored investment value, rather than asset value, as the most important of the three elements." *Oakridge,* 937 P.2d at 133 (citing *Dudley v. Mealey,* 147 F.2d 268, 270 (2d Cir.1945)). This is because " '[t]he assets of a company are of value chiefly because of their earning capacity.' " *Id.* (quoting *In re Valuation of Common Stock of Libby, McNeill & Libby,* 406 A.2d 54, 66 (Me.1979)).

¶ 21 Where share price on an active, high-volume market is " 'a fair reflection of the judgment of the investing public, a court may justifiably assign a greater weight to stock market price than to net asset value or investment value.' " *Id.* at 132 (quoting *Libby,* 406 A.2d at 63). However, " 'market value may not be taken as the sole measure of the value of the stock.' " *Id.* (quoting *Bell v. Kirby Lumber Corp.,* 413 A.2d 137, 141 (Del.1980)). This is because "market price is subject to fluctuation for many reasons other than the intrinsic worth of the stock or the condition of the corporation." *Id.* (quoting *Woodward v. Quigley,* 257 Iowa 1077, 133 N.W.2d 38, 40 (1965)).

A. The Trial Court's Findings of Fact Were Adequately Detailed.

¶ 22 PAJ first contends that the trial court's findings of fact lack adequate detail with respect to the court's determination of fair value. Peterson seeks to characterize PAJ's claim as an attack on "the weight or sufficiency of the evidence the trial court relied upon in making its judgment, such as the comparability of the Townsend Valuation market sample, the application of R-squared, the amount of goodwill included in the fair value of PAJ," and other matters. Peterson then argues that PAJ "should not be allowed to sidestep the marshaling requirement by cloaking its factual and evidence-weighing challenges under the guise of 'insufficient findings.' " In response, PAJ is explicit that its challenge presents a question of law regarding the adequacy of the findings, not a question of fact regarding the sufficiency of the evidence. Defining the issues on appeal is the right and burden of the appellant. *See State v. Honie,* 2002 UT 4, ¶ 67, 57 P.3d 977 ("[T]he appellant is required to clearly define the issues and provide accompanying argument and authority."). We therefore confine our review to the adequacy of the trial court's findings, and do not inquire into whether those findings are supported by sufficient evidence.

¶ 23 To be legally adequate, a trial court's findings of fact "must show that the court's judgment or decree follows logically from, and is supported by, the evidence. The findings should contain enough detail and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *An-*

*drus v. Andrus,* 2007 UT App 291, ¶ 17, 169 P.3d 754.

 ¶ 24 The trial court's April 17 Memorandum Decision was a thirteen-page, single-spaced decision, whose ultimate finding was that the fair value of Peterson's shares of the Company was $459,000. Subsidiary to this finding was the trial court's finding that Townsend's report was a better indicator of fair value than Bowles's. The trial court explained why it rejected Bowles's method of valuation. First, Bowles relied wholly on the asset-based approach to value. Second, because "PAJ is not being liquidated ... the asset-based approach is the least reliable of the valuation methods." Third, Bowles valued the Company using "a fair value concept in which the ownership interest is valued in the hands of a specific owner or buyer," as opposed to a fair value concept in which the ownership interest is valued as if it were placed on the open market for sale. As the trial court correctly noted, under *Hogle v. Zinetics Medical, Inc.,* 2002 UT 121, 63 P.3d 80, "'fair value' is not measured by any unique benefits that will accrue" to the acquiring party. *Id.* ¶ 17 (internal quotation marks omitted).

¶ 25 By contrast, the trial court noted that Townsend "considered all three valuation techniques mentioned in *Hogle* and subsequently applied a percentage weight to the value calculated under each method to arrive at a weighted average. Although there was never an established method in determining the percentage weight of each value, [Townsend] did offer a reasonable and educated explanation for making the assumptions he did." In addition, the trial court commented on Jackson's 2001 buy-in price. Using the formula used to calculate Jackson's buy-in price, Peterson's shares were worth $517,763.17, approximately 13% higher than the $459,000 value ultimately determined by the trial court. The trial court expressly stated that it used the 2001 buy-in price "as a guidepost in its decision" and "was influenced heavily by this transaction," although it did not ultimately rely on it. Based on this April 17 Memorandum Decision, the trial court entered its May 6 Judgment.

¶ 26 PAJ moved to amend the May 6 Judgment on the ground that the trial court's findings were inadequately detailed. Among PAJ's complaints was that "[t]he Court failed to make *any* findings justifying the applicability of Townsend's market analysis, including a finding as to whether Townsend's market data is comparable to PAJ given the vast discrepancy between Townsend's market and income approaches." (Emphasis added.)

¶ 27 As demonstrated above, the trial court did make findings explaining its reasoning in rejecting Bowles's valuation and adopting Townsend's. Nevertheless, the trial court responded to PAJ's concerns in its July 20 Memorandum Decision and August 6 Judgment. The trial court indicated that it thought PAJ was "merely attempting to persuade this Court to reconsider the weight it attributed to the 2001 buy-in," and stated that it did "not feel it necessary to amend any 'findings' with regard to the 2001 buy-in formula." The court opted to make "additional findings to ensure its Decision is sufficiently detailed to disclose the steps on which this ultimate conclusion was reached." Among the additional findings was one directed at Townsend's approach:

> Townsend's market analysis data was comparable to and appropriately considered in the valuation of [the Company], as shown by a high correlation to [the Company] of 0.92. Townsend testified that such a high correlation was rare and therefore determined the market approach to be very appealing in determining value for this particular company.

The trial court again repeated that it found Townsend's report to be "more convincing [than Bowles's] because [Townsend] used widely accepted principles of financial analysis ... [and] addressed the three most recognized valuation methods that the Supreme Court of Utah has relied on ... [rather than] only the asset based approach."

¶ 28 Though framed as challenges to the adequacy of the trial court's findings, PAJ's criticisms are often aimed at the substance of the Townsend Report, and thus at the sufficiency or persuasiveness of the evidence. For example, PAJ criticizes the trial court's use of .92:

This single finding poses two problems: First, it demonstrates a misunderstanding of the statistical term R-squared and the application of .92. Second, the trial court failed to make the subsequent findings that would make the number relevant to the valuation of [the Company]. Absent these accurate and detailed findings, a reviewing court cannot ensure that the trial court applied correct law or that its discretionary determination was rationally based.

PAJ then explains the statistical term R-squared and further itemizes ways in which it believes the Townsend method is flawed. For example, PAJ asserts that none of Townsend's comparables had as great a volume of annual sales as PAJ, that Townsend had excluded companies with gross revenue under $100,000, that Townsend's methodologies varied by over 271% among themselves, that Townsend did not consider various criteria, and that "the trial court failed to reconcile its determination of the fair value of [the Company] with the required rate of return to owners of the corporation given its finding on the amount of reasonable compensation."

¶ 29 The process of business valuation lacks the mathematical precision its numbers and formulas might suggest. For example, although Bowles ultimately placed the Company's value at $617,649, his intermediate estimates ranged as high as $712,556, depending on the approach he employed. Townsend's intermediate estimates ranged from $375,019 to $1,963,581. At trial, each party urged the court to accept the valuation calculated by that party's expert. The trial court "refused to take a 'Solomon' approach" because doing so "would negate both expert opinions and require the Court to pick a number out of thin air." In addition, the trial court concluded, and we agree, that the valuation approach followed in the Bowles report strayed from the clear guidance given by our supreme court. In part for this reason, the trial court adopted the Townsend report as the more reliable estimate of value. Doing so did not obligate the trial court to enter findings reconciling every conceivable inconsistency in Townsend's calculations, any more than a judge whose ruling is based on the testimony of the more credible of two witnesses is required to reconcile every inconsistency in that witness's testimony. What is required is that the trial court's findings "should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Andrus v. Andrus*, 2007 UT App 291, ¶ 17, 169 P.3d 754. The trial court's findings here satisfy that requirement.

¶ 30 To the extent PAJ's real challenge is to the consistency or persuasiveness of the evidence, it requires a different analysis, beginning with marshaling the evidence. PAJ's critique of Townsend's report falls into this category. It is a challenge, not to the adequacy of the trial court's findings, but to the evidence underlying them. It therefore falls outside the scope of the issue on appeal as framed by PAJ. For this reason, we do not address PAJ's challenge to Townsend's methodology. *See Brigham City v. Stuart*, 2005 UT 13, ¶ 14, 122 P.3d 506 (refusing to address "issues which have not been properly preserved, framed and briefed"), *rev'd on other grounds*, 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

¶ 31 As stated above, the trial court clearly and at length explained how it reached the valuation it did, why it found Townsend's approach more reliable, and how it treated the 2001 buy-in price. We therefore conclude that the trial court's findings of fact concerning valuation of the business were adequately detailed to satisfy legal requirements.

**B. The Trial Court Did Not Err in Evaluating Peterson's Goodwill.**

¶ 32 Next, PAJ challenges the trial court's decision to include Peterson's personal goodwill in its calculation of fair value. "[W]hether a given fact or circumstance is relevant to fair value ... is a question of law which we review de novo." *Hogle v. Zinetics Med., Inc.*, 2002 UT 121, ¶ 10, 63 P.3d 80.

¶ 33 The trial court followed the Townsend report in not deducting the value of Peterson's personal goodwill from the Company's value, reasoning that Peterson's noncompetition agreement effectively transferred his personal goodwill to the Company:

Townsend's exclusion of any personal goodwill deduction was appropriate where that expert gave considerable weight to [Peterson]'s employment contract, and opined that such constructively affixed any of [Peterson]'s personal goodwill with [the Company] as an enterprise. As Townsend testified, where personal goodwill has become transferrable, it is no longer personal.

PAJ contends that the trial court committed error by failing to reduce the Company's value by offsetting the personal goodwill attributable to each shareholder. PAJ also argues that the trial court's findings with respect to goodwill are inadequately detailed.

¶ 34 Peterson responds that the trial court properly considered and allocated goodwill in reliance on Townsend's report, and that the court's findings are sufficient. Peterson further contends that the trial court did not in fact include any *personal* goodwill in its valuation of the Company, because his noncompetition agreement "converted personal goodwill, if any, to enterprise goodwill."

¶ 35 "Goodwill is the advantage ... acquired by an establishment, beyond the mere value of the capital, stocks, funds or property employed therein, in consequence of the general patronage ... it receives from ... habitual customers on account of its location, or local position or reputation for quality, skill, integrity or punctuality." *Jackson v. Caldwell,* 18 Utah 2d 81, 415 P.2d 667, 670 (1966). "It is the probability that old customers will resort to the old place or seek old friends, and the likelihood of new customers being attracted to well advertised and favorably known services or goods." *Id.*

¶ 36 A number of factors play a role in the way courts view goodwill in the context of business valuations. One such factor is whether the business is being dissolved. As a general rule, "a professional partnership the reputation of which depends on the individual skill of the members, such as partnerships of attorneys or physicians has no 'good will' to distribute as a firm asset on its dissolution." *Id.* (internal quotation marks omitted). The same is true "in a partnership of public accountants, unless the parties have in their partnership agreements provided otherwise, or the facts and circumstances of the particular case would require a modification of the general rule." *Id.*

¶ 37 Another factor is the distinction between a sole practitioner and an association of practitioners. "The reputation of a sole practitioner is personal, as is a professional degree." *Sorensen v. Sorensen,* 839 P.2d 774, 776 (1992). " 'There can be no good will in a business that is dependent for its existence upon the individual who conducts the enterprise and would vanish were the individual to die, retire or quit work.' " *Stonehocker v. Stonehocker,* 2008 UT App 11, ¶ 44, 176 P.3d 476 (quoting *Stevens v. Stevens,* 754 P.2d 952, 956 (Utah Ct.App.1988)). The same is not necessarily true where a business consists of a group of professionals. *See Sorensen,* 839 P.2d at 775–76 (citing *Gardner v. Gardner,* 748 P.2d 1076, 1078 (Utah 1988) (contrasting a solo practice with a twenty-three-physician clinic)). *Gardner v. Gardner,* 748 P.2d 1076 (Utah 1988), involved the valuation of a husband's interest in a twenty-three-physician clinic in the context of a divorce. *See id.* at 1077. The supreme court observed that the clinic was a "well-entrenched institution" involving many physicians and therefore not dependent on the earning capacity of any one physician. *See id.* The court reversed and remanded for additional findings pertaining to "the good will inherent in the professional clinic." *Id.* at 1080.

¶ 38 Another relevant consideration is the distinction between types of goodwill. Courts recognize two general types of goodwill: "enterprise goodwill (also called commercial or professional goodwill) and personal goodwill (also called professional goodwill)." *May v. May,* 214 W.Va. 394, 589 S.E.2d 536, 541 (2003). " 'Enterprise goodwill attaches to a business entity and is associated separately from the reputation of the owners. Product names, business locations, and skilled labor forces are common examples of enterprise goodwill.' " *Id.* (quoting Courtney E. Beebe, *The Object of My Appraisal: Idaho's Approach to Valuing Goodwill as Community Property in Chandler v. Chandler,* 39 Idaho L.Rev. 77, 83–84

(2002)). " 'Personal goodwill is associated with individuals. It is that part of increased earning capacity that results from the reputation, knowledge and skills of individual people.' " *Id.* at 542 (quoting Diane Green Smith, *'Til Success Do Us Part: How Illinois Promotes Inequities in Property Distribution Pursuant to Divorce by Excluding Professional Goodwill*, 26 J. Marshall L.Rev. 147, 164–65 (1992)).

¶ 39 Finally, an analysis of goodwill is tied closely to the question of whether a departing firm member has died, retired, or—relevant here—entered into an agreement not to compete. " '[A] covenant not to compete is necessary for the protection of the goodwill of [a] business' " where a departing employee might " 'draw away customers . . . if he were permitted to compete nearby.' " *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 88 (Utah 1992) (quoting *System Concepts, Inc. v. Dixon*, 669 P.2d 421, 426 (Utah 1983)). Indeed, a requirement for an enforceable covenant not to compete is that it "must be necessary to protect the goodwill of the business." *Id.* at 88 n. 1. If the employee has signed an enforceable covenant not to compete, "an employer is . . . entitled to the good will created by his employee, as is the purchaser of an establishment which includes the good will of the business." *System Concepts*, 669 P.2d at 426.

¶ 40 Thus, "personal goodwill [can] be transferred to a business via a non-compete agreement." Darian M. Ibrahim, *The Unique Benefits of Treating Personal Goodwill as Property in Corporate Acquisitions*, 30 Del. J. Corp. L. 1, 21 (2005); *see also Krug v. Commissioner*, 42 T.C.M. (CCH) 1114 (1981) (considering "whether the non-compete covenant can be severed from the transfer of goodwill or is merely a protective accompaniment to the transfer of goodwill" (citing *Ullman v. Commissioner*, 264 F.2d 305 (2d Cir.1959), *aff'g.* 29 T.C. 129 (1957)); *Michaels v. Commissioner*, 12 T.C. 17 (1949)); *Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.*, 270 Neb. 286, 702 N.W.2d 355, 371 (2005) (noting that "adherence to the agreement not to compete is

often critical to the transfer of goodwill"); *McReath v. McReath*, 2010 WI App 101, ¶ 18, 329 Wis.2d 155, 789 N.W.2d 89 (noting that the "non-compete aspect of the sale would be a mechanism for the transfer of some portion of [orthodontist's] professional goodwill to the buyer").[2]

¶ 41 These factors all weigh in favor of including Peterson's past goodwill in the valuation of the Company under the facts and circumstances of this case. The firm is not being dissolved, but continues to operate. In fact, it continues to operate under the same name, "Peterson Allred Jackson, PC," at the same business location, and with the same phone number as before. In addition, unlike the solo practice in *Stonehocker v. Stonehocker*, 2008 UT App 11, 176 P.3d 476, the Company is a "well-entrenched institution," *Gardner*, 748 P.2d at 1080, not dependent on the earning capacity of any one person.

¶ 42 Furthermore, Peterson, like the other two shareholders, signed a noncompetition agreement. That agreement prohibited him, for a period of two years after termination of his employment with the Company, from directly or indirectly soliciting to provide, or providing, accounting services to anyone who was a client of the firm during the twelve months preceding his departure. The only exceptions were "immediate family members." PAJ points to nothing in the record to negate the logical inference that this noncompetition agreement, like such provisions generally, was intended to enhance "the probability that old customers will resort to the old place," *Jackson v. Caldwell*, 18 Utah 2d 81, 415 P.2d 667, 670 (1966), despite Peterson's departure—that is, that the covenant not to compete was intended to transfer his personal goodwill to the Company. In view of the foregoing, we find no error in the trial court's decision not to discount the valuation of the Company for Peterson's personal goodwill.

¶ 43 PAJ further contends that the trial court's finding regarding goodwill is inadequate. However, PAJ also maintains, and

---

**2.** The tax consequences of payment for a covenant not to compete and payment for goodwill might differ, however. *See Krug v. Commissioner*, 42 T.C.M. (CCH) 1114 (1981).

we agree, that the question of whether the non-solicitation or noncompetition agreement converted personal goodwill to enterprise goodwill is a question of law. Accordingly, the trial court was not required to resolve any contested factual issues. *See generally* Utah R. Civ. P. 52(a). In any event, the trial court's findings demonstrate that its ruling on this issue "follows logically from, and is supported by, the evidence." *Andrus v. Andrus,* 2007 UT App 291, ¶ 17, 169 P.3d 754. The trial court relies on Townsend's testimony. Townsend testified at length concerning goodwill, explaining in particular the role of the noncompetition agreement. We have no difficulty discerning from the trial court's ruling "the steps by which the ultimate conclusion . . . was reached." *Id.*

C. The Trial Court's Calculation of Jackson's "Buy–In" Price Is Not a Clerical Error.

¶ 44 Next, PAJ challenges the trial court's use of Jackson's 2001 buy-in price. The trial court used a three-part equation to determine the value of Jackson's buy-in: "using a value calculation of the gross sales [for the year 2001,] times 0.9, times the percentage of stock (i.e. $750,000 × .9 × 15.83% = $106,852.50)." The trial court determined that "[a]pplying this formula to [Peterson's] shares would result in his shares being worth $517,763.17." This is $58,763.17 more than the value determined by the court.

¶ 45 On appeal, PAJ challenges this formula. Specifically, PAJ objects to the trial court's use of .9 as the multiplier and asserts that the trial court should instead have used .5. PAJ maintains that the use of .9 is a mathematical error and asserts that a "mathematical error constitutes an error correctable under Rule 60(a) [of the Utah Rules of Civil Procedure]." That rule provides that "[c]lerical mistakes in judgments . . . arising from oversight or omission may be corrected by the court at any time." Utah R. Civ. P. 60(a).

¶ 46 "The correction contemplated by Rule 60(a) must be undertaken for the purpose of reflecting the actual intention of the court and parties. Rule 60(a) is not intended to correct errors of a substantial

nature, particularly where the claim of error is unilateral." *Lindsay v. Atkin,* 680 P.2d 401, 402 (Utah 1984) (citation omitted). "[U]nder Rule 60(a), it matters little whether an error was made by the court clerk, the jury foreman, counsel, a party, or the judge himself, so long as it is clearly a formal error that should be corrected in the interest of having judgment, order, or other part of the record reflect what was done or intended." *Bishop v. GenTec,* 2002 UT 36, ¶ 30, 48 P.3d 218 (internal quotation marks omitted). "The distinction . . . depends on whether [the error] was made in rendering the judgment or in recording the judgment as rendered." *Bagnall v. Suburbia Land Co.,* 579 P.2d 917, 918 (Utah 1978) (alteration in original) (internal quotation marks omitted).

¶ 47 In the July 20 Memorandum Decision, the trial court explained that it did not determine the .9 multiplier, but merely applied to Peterson's shares the very formula that the parties themselves had used to value Jackson's shares. That formula contained the .9 multiplier:

When the parties were dealing cordially with one another they came up with simple and easy valuation formulas which all seemed to be based on approximately 90 percent of their revenues. While the Court used the simple 2001 buy-in formula for ease in the Decision, the buy-sell agreements also used an approximate 0.90 multiplier. . . . It was the simple formula itself and the parties' seeming reliance on the 90 percent of revenue in the buy-sell agreements.

The court concluded that PAJ was "merely attempting to persuade this Court to reconsider the weight it attributed to the 2001 buy-in."

¶ 48 PAJ contended below, and contends on appeal, that the "correct formula of Jackson's 2001 buy-in was not .90 times earning, but .50." But PAJ makes no attempt to demonstrate that the trial court's choice of a .9 multiplier was "a formal error that should be corrected in the interest of having judgment . . . reflect what was done or intended." *See Bishop,* 2002 UT 36, ¶ 30, 48 P.3d 218 (internal quotation marks omitted). Nor

does PAJ demonstrate or even assert that the trial court's choice of a .9 multiplier was not "made in rendering the judgment," but rather "in recording the judgment as rendered." *Bagnall*, 579 P.2d at 918. In fact, the record shows that the trial court's use of the multiplier was a choice, not a clerical or mathematical error. Accordingly, no rule 60(a) error occurred.

■ ¶ 49 Any error was harmless in any event. *See State v. Evans*, 2001 UT 22, ¶ 20, 20 P.3d 888 ("[H]armless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings. Put differently, an error is harmful only if the likelihood of a different outcome is sufficiently high that it undermines our confidence in the verdict." (citation omitted)). The court expressly disavowed its earlier reliance on the Jackson buy-in formula. In the April 17 Memorandum Decision, the trial court explained that it used the formula "as a guidepost." But in the July 20 Memorandum Decision, the trial court stated that it "ultimately did not rely upon [the formula] when determining the fair value of [Peterson]'s shares." In other words, the trial court, upon reflection, determined that even without the Jackson buy-in evidence its ultimate valuation would be the same.

## II. Issues Raised by the Cross–Appeal

### A. The Trial Court Did Not Err in Ruling on the Undistributed Cash.

¶ 50 Peterson challenges the trial court's determination that Peterson was "not entitled to any distribution of cash reserves up to December 31, 2006 held by the Corporation." The court is obligated to determine "the fair value of [Peterson]'s shares as of the ... date the court determined to be appropriate ... and based on the factors the court determines to be appropriate." Utah Code Ann. § 16–10a–1434(4) (Supp.2010).

¶ 51 Historically, PAJ had kept approximately $10,000 in reserve from year to year and distributed any excess cash to the partners. On December 31, 2006, there was approximately $138,000 in cash, and no distributions were made. Townsend concluded

that, of the cash in reserve, $128,196 was "excess," and Peterson's 36.37% share of that was $46,624.89. Townsend reached this number by starting with $138,442 and subtracting $10,246, which was the average amount of cash on hand at the end of years 2002 through 2005. The trial court rejected this calculation and refused to award Peterson any of the undistributed cash:

> [Townsend] reduced cash in the adjusted balance sheet approach so as to avoid double counting excess cash in its valuation report. Unfortunately, the Court could not find nor determine what [Townsend's] subsequent value would be had the excess cash been included and the Court was not willing to speculate. Therefore, the court finds that [the Company] had the right to change business practices by keeping excess cash as reserves instead of distributing it and that [Peterson] was not entitled to any distribution thereof. Additionally, [the Company has] maintained this cash reserve practice since [Peterson] was fired.

In fact, the evidence showed that the Company continued to build its cash reserves after January 2007.

¶ 52 At first blush, logic might suggest that, as Peterson was entitled to 36.37% of the value of the Company as a whole, he was likewise entitled to 36.37% of the value of its various components, including undistributed cash. And this would indeed be true if the Company were being liquidated and thus valued under the asset approach. But the trial court and Townsend both recognized that "in the absence of actual liquidation a corporation must be valued as a going concern." *See Hogle v. Zinetics Med., Inc.*, 2002 UT 121, ¶ 20, 63 P.3d 80. Of course, no company can conduct day-to-day business without cash in the till. The real question, then, is how much cash was appropriate for the Company to retain, and how much was in fact "excess." Peterson claims that only $10,000 of the cash on hand was necessary to run the business. He points out that the Company's cash reserves as of December 31 averaged around $10,000 for the preceding four years. He also charges that PAJ's decision not to make the customary year-end distribution "was done knowingly, intentionally, and oppres-

sively to exclude Peterson from his share of Company funds."

¶ 53 PAJ responds that the $138,000 figure is not unduly high, but in line with recommended amounts for firms of this size, and that the retention of the cash was necessary to cover upcoming expenses for January and large expenses that might arise after tax season. PAJ also argues that one of the historical sources of contention among the shareholders was how much cash on hand to retain. Jackson testified that the Company often functioned "hand-to-mouth and the stress of meeting the monthly payroll and the bills really created some anxiety for [Allred] and so we felt that it would be necessary, prudent, and wise for us to start to work toward gaining cash as we could and so we tried to do that." Jackson explained that keeping a large cash reserve helped them accumulate more cash flow so they would not have problems "hold[ing] rent checks" or "delay[ing] payment of bills."

¶ 54 The trial court found that the Company "had the right to change business practices," that is, to retain more cash on hand than it had done previously. Although the trial court refers to the cash as "excess," it found that the cash was appropriately held as reserves, in effect ruling that none of the cash on hand on December 31, 2006, was "excess." This is a factual finding, which we will affirm absent clear error. *See* Utah R. Civ. P. 52(a); *Lefavi v. Bertoch*, 2000 UT App 5, ¶ 16, 994 P.2d 817. In addition, because this determination was "extremely fact-sensitive," a party attacking it on appeal has "a duty to marshal the evidence." *See Chen v. Stewart*, 2004 UT 82, ¶ 20, 100 P.3d 1177 (citing *In re Estate of Beesley*, 883 P.2d 1343, 1347–49 (Utah 1994)). Peterson does not claim the trial court committed clear error, nor does he marshal the evidence supporting the trial court's determination. In-

stead, he contends that this issue presents a question of law. Yet, even his own description of the issue bristles with factual questions. Whether Allred and Jackson acted oppressively, whether $138,000 is a reasonable amount of cash for an accounting firm the size of PAJ to keep on hand, and whether the Company's continuing to increase its cash on hand was done as a matter of business strategy or litigation strategy are not questions that any case or statute can answer. And despite maintaining that the issue is one of law, Peterson cites no law addressing it.[3] Accordingly, we will not disturb the court's ruling.

**B. The Trial Court's Award of Prejudgment Interest Was Correct.**

¶ 55 In addition to determining that Peterson was entitled to $459,000 for his shares in the Company, the trial court awarded Peterson prejudgment interest on that sum from December 31, 2006, as follows: 6.99% for 2007; 5.42% for 2008; 2.40% for 2009; and $29.86 per day thereafter. The trial court calculated these amounts using the statutory postjudgment interest rates.

¶ 56 Peterson argues that he is entitled to prejudgment interest at "the statutory prejudgment rate of 10%." He relies on a statute in Part 13 of the Act. That statute provides for interest "at the statutory rate set forth in Section 15–1–1, compounded annually." Utah Code Ann. § 16–10a–1301(5) (2009). The interest rate set forth in section 15–1–1 is 10% per year. Utah Code Ann. § 15–1–1(2) (2009). However, this definition is expressly "[f]or purposes of Part 13." *Id.* § 16–10a–1301. This case was brought under Part 14. Part 14 allows the trial court to award interest, but requires the trial court to determine an equitable rate: "Interest may be allowed at the rate and from the date determined by the court to be equitable." *Id.* § 16–10a–1434(5)(c) (Supp.2010). In ex-

---

3. Peterson does assign error to the trial court's refusal to "speculate" as to how treating the approximately $128,000 as an operating asset might have altered Townsend's conclusion of value. Townsend classified the $128,000 as excess cash. Consequently, he segregated it from his calculations of value under the market and income approaches. He did not do an alternative calculation based on the assumption that the $128,000 was an operating asset rather than excess cash. And the trial court "was not willing to speculate" on the degree to which treating this amount as an operating asset would have affected Townsend's income and market approach valuations. In effect, the trial court declined to recalculate Townsend's market and income approach valuations. This was not error.

ercising the discretion granted it by this statute, the trial court awarded interest based on the postjudgment interest rates, as codified by section 15–1–4. *See* Utah Code Ann. § 15–1–4 (Supp.2010); *see also* Utah State Courts, Post Judgment Interest Rates (Jan. 3, 2011), http://www.utcourts.gov/resources/intrates/interestrates.htm (last visited March 29, 2011) (listing postjudgment interest rates for years 1993–2011).

¶ 57 Peterson acknowledges that section 16–10a–1434 grants the trial court a measure of discretion, but insists that "such equitable discretion cannot be used arbitrarily, capriciously and without rational basis." He further reasons that, "[a]bsent an expressed reason and justification for deviating from the legislative standard of ten percent prejudgment interest rate, the court is required to follow [that] standard."

¶ 58 While we agree with Peterson that a court may not exercise its equitable discretion arbitrarily, capriciously, and without rational basis, we see no evidence of that here. The trial court's reliance on the floating postjudgment interest rate was rational. Nor do we see anything in section 16–10a–1434(5)(c) that would require the trial court to comply with a different statute in a different part of the Utah Code or explain its failure to do so. We are satisfied that the trial court did not exceed its discretion here.

C. The Trial Court Did Not Abuse Its Discretion in Not Awarding Attorney Fees.

¶ 59 At trial, Peterson sought costs and attorney fees. The trial court did not award them, and Peterson now challenges that ruling. Generally, "whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Kealamakia, Inc. v. Kealamakia*, 2009 UT App 148, ¶ 3, 213 P.3d 13 (internal quotation marks omitted). Here, however, attorney fees are awarded under Utah Code section 16–10a–1434(5)(d). *See* Utah Code Ann. § 16–10a–1434(5)(d). That section grants discretion to the trial court to award attorney fees in some circumstances: "If the court finds that the petitioning shareholder had probable grounds for relief under Subsection 16–10a–1430(2)(b) or (d), it *may* award ... reason-

able fees and expenses of counsel and experts." *Id.* (emphasis added). The "probable grounds for relief" referred to include that "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent," *id.* § 16–10a–1434(5)(b), or that "the corporate assets are being misapplied or wasted," *id.* § 16–10a–1434(5)(d).

¶ 60 The trial court examined this question at length. After surveying the evidence in the case, the court compared the dispute to "a nasty divorce" and expressed disappointment that "educated, intelligent and otherwise reasonable men" were unable to resolve their differences more amicably. The court described the parties' falling-out in largely neutral terms: "Partners and shareholders have the right to make decisions that they deem in the best interest of the company, however unpleasant they may be." The court concluded that PAJ's actions were not oppressive: "The Court does find that while the Defendants' actions may have been insensitive, disloyal, exclusionary, or overly aggressive, they were not oppressive." Similarly, the court concluded that PAJ's actions "do not rise to the level of a misapplication or a waste of corporate assets." Accordingly, it exercised its discretion not to award attorney fees to Peterson. Peterson challenges this ruling. He contends that he is entitled to attorney fees "because PAJ engaged in oppressive conduct and/or misapplication or wasting of corporate assets."

¶ 61 Peterson's claim falls short for two reasons. First, we believe Peterson has mischaracterized the nature of his challenge on appeal. He describes this claim as posing a question of law, since he "is not challenging any of the findings of fact made regarding oppression, but rather the legal conclusion that such facts do not constitute legal oppression warranting dissolution." However, whether PAJ's acts here were oppressive is a question, not of law, but of ultimate fact. "If a trial court's finding of ultimate fact is made in compliance with the relevant legal guidelines, we have no cause to review its 'correctness.'" *State v. Rochell*, 850 P.2d 480, 486 (Utah Ct.App.1993) (Bench, J., concurring). "Therefore, absent a legal

challenge, we may only review the finding to see if it is 'against the clear weight of the evidence.' " *Id.* (quoting *State v. Walker,* 743 P.2d 191, 193 (Utah 1987)). Peterson does not claim that the court's determination violates any law, only that it is inconsistent with subsidiary findings of fact. Peterson highlights many facts that would support a finding of oppressiveness. But other facts, noted at length in PAJ's brief, support the trial court's ultimate findings. Accordingly, we cannot say that the trial court's findings "are against the clear weight of the evidence," nor do we harbor "a definite and firm conviction that a mistake has been made," *see Walker,* 743 P.2d at 193.

¶ 62 Second, even if the trial court had found that PAJ's behavior was oppressive or that PAJ wasted or misapplied corporate resources, that finding would not have required the trial court to award attorney fees. Rather, even under that circumstance, the statute provides that the trial court "may" award attorney fees. *See* Utah Code Ann. § 16–10a–1434(5)(d). The question is thus within the trial court's discretion. Here, for reasons relating to the nature of the dispute, the trial court chose not to award attorney fees, and we perceive no abuse of discretion in that choice.

### CONCLUSION

¶ 63 In conclusion, we affirm on all issues. First, we conclude that the trial court's findings of fact were adequate. Second, we conclude that the trial court did not err in evaluating Peterson's goodwill in its determination of fair value. Third, we conclude that the trial court's calculation of Jackson's 2001 buy-in price was neither a mathematical error correctable under rule 60(a) nor harmful. On cross-appeal, we affirm the trial court's decision that Peterson was not entitled to any portion of the undistributed cash. We also affirm the trial court's award of prejudgment interest and refusal to award attorney fees.

¶ 64 Finally, Peterson seeks attorney fees on appeal on the ground that PAJ's position on appeal was frivolous. As should be apparent from the foregoing discussion, we find both parties' positions on appeal to be rea-

sonable. We therefore award no fees on appeal.

¶ 65 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and STEPHEN L. ROTH, Judge.