2007 UT App 383

**NATURE'S SUNSHINE PRODUCTS, INC., a Delaware corporation, Plaintiff and Appellee,**

**v.**

**Wayne B. WATSON, an individual; and MoneyCode, Inc., a Nevada corporation, Defendants and Appellant.**

No. 20060534–CA.

Court of Appeals of Utah.

Dec. 6, 2007.

Evan A. Schmutz and Kirsti H. Hansen, Provo, for Appellant.

Paul D. Veasy and John P. Ball, Salt Lake City, for Appellee.

Before BENCH, P.J., GREENWOOD, Associate P.J., and ORME, J.

## OPINION

ORME, Judge:

¶ 1 Wayne B. Watson appeals the district court's grant of summary judgment in favor of Nature's Sunshine Products, Inc. The appeal raises an important issue about the extent to which a trust deed's dragnet clause will secure new indebtedness. We affirm.

## BACKGROUND [1]

¶ 2 On November 23, 1987, Watson gave a promissory note to First Security Bank memorializing a home equity line of credit in the amount of $75,000. The promissory note was secured by a trust deed (the First Trust Deed) and constituted a lien against valuable property (Hobble Creek) owned by Watson. The First Trust Deed was recorded on November 24, 1987.

¶ 3 The First Trust Deed contains both a dragnet clause [2] and a modification clause. The dragnet clause provides, with our emphasis, that the First Trust Deed was given

FOR THE PURPOSE OF SECURING (1) payment of all obligations now or hereafter arising pursuant to or otherwise related or connected to that certain "First Security Home Equity Line Agreement, Note, and Disclosure Statement" of even date herewith executed by the Trustor (the "Agreement"), which Agreement evidences a revolving credit line in the maximum principal sum of SEVENTY FIVE THOUSAND AND 00/100 Dollars ($75,000.00) together with interest, costs, and expenses, as therein provided, payable to the order of Beneficiary at the times, and in the manner and with interest as therein set forth, *together with any extensions, renewals, modifications, and future advances thereof or thereunder;* (2) the performance of each agreement of Trustor herein contained; (3) the payment of all sums expended or advanced by Beneficiary under

---

1. "In considering an appeal from summary judgment, we view the facts in a light most favorable to the nonmoving party. We recite the facts accordingly," *Baldwin v. Burton*, 850 P.2d 1188, 1190 (Utah 1993) (footnote omitted), borrowing liberally from the trial court's summary judgment ruling.

2. A leading legal dictionary defines a dragnet clause as a "Mother Hubbard" clause, *Black's Law Dictionary* 531 (8th ed.2004), which is "[a] clause stating that a mortgage secures all the debts that the mortgagor may at any time owe to the mortgagee." *Id.* at 1036.

or pursuant to the terms of this Trust Deed and/or the Agreement, together with interest thereon as provided therein.

The modification clause, contained in paragraph 10, provides in part as follows:

At any time, and from time to time upon written request of Beneficiary, ... Trustee may ... grant any extension or modifications of the terms of the Agreement[.]

¶ 4 On September 28, 1994, Watson borrowed $775,315 from Nature's Sunshine Products (NSP). The loan was memorialized in a promissory note and secured by a trust deed on Hobble Creek (NSP Trust Deed), which was recorded on October 4, 1994. The NSP Trust Deed was subordinate to the First Trust Deed. In 1998, First Security Bank assigned the First Trust Deed to Carlos Watters. On October 22, 2003, Watters further assigned the First Trust Deed to MoneyCode, Inc. Also on October 22, 2003, Watson and MoneyCode, purporting to "modify" the First Trust Deed pursuant to the paragraph 10 modification clause, entered into an agreement whereby Watson borrowed $1,230,000 from MoneyCode, which was to be secured by the First Trust Deed. This agreement recited:

Come now the parties, Beneficiary and Trustor, of that certain Home Equity Line Note dated the 23rd Day of November, 1987 and [the First Trust Deed] of same date and agree to modify them pursuant to and in accordance with the language of the Note and Paragraph 10 of the [First] Trust Deed.[3]

¶ 5 On October 23, 2003, the day after Watson and MoneyCode entered into the modification agreement, NSP's trustee held a nonjudicial foreclosure sale under the NSP Trust Deed, Watson having previously defaulted on his obligation secured by the NSP Trust Deed. NSP, the successful bidder, thereby acquired Watson's interest in Hobble Creek, subject to the rights of any senior lienholders of record.

¶ 6 On November 16, 2003, Watson executed a deed in favor of MoneyCode in lieu of foreclosure of the First Trust Deed. That same day, MoneyCode leased Hobble Creek to Watson, and he remained in possession. A few days later, NSP filed an unlawful detainer action against Watson to secure his removal from Hobble Creek. In that action, the trial court found that, inter alia, "MoneyCode was not entitled to collect the rents on [Hobble Creek] as [NSP], as the holder of the possessory interest in the property, was entitled to those rents until that possessory interest was extinguished by foreclosure."

¶ 7 In March 2004, MoneyCode recorded a notice of default under the First Trust Deed. NSP then filed this action in district court, seeking a declaratory judgment regarding the parties' rights and priorities in Hobble Creek, including the amount MoneyCode was properly owed under the First Trust Deed.

¶ 8 A few weeks later, NSP filed a motion for summary judgment, arguing that Watson and MoneyCode

have attempted to unilaterally modify [the First Trust Deed] from the maximum amount of $75,000 to $1,230,000 with a new Note entered into between MoneyCode and Watson. This attempt was made one day prior to [NSP]'s trustee's sale of [the NSP Trust Deed], and without notice and the consent of [NSP]. This purported attempt is highly prejudicial to the ownership rights of [NSP].

NSP requested "an Order that elevates [NSP]'s ownership interest to a senior status to that of MoneyCode's for that amount above the maximum $75,000 pledged originally and ... a full accounting as to what MoneyCode claims is due and owing from Watson under the [First Trust Deed]."

¶ 9 The trial court granted NSP's motion for summary judgment. In its ruling, it noted that "the modification [of the First Trust Deed] is so extreme, so out of the ordinary and so unlike the other ministerial

---

**3.** In its summary judgment ruling, the district court noted:

The effect of the [MoneyCode] Note and the transaction which it memorialized was to provide that the loan from MoneyCode to Watson in the sum of $1,230,000 was secured by the [First Trust Deed]; and that in the event of default by Watson, MoneyCode could foreclose the [First Trust Deed] and could exercise all of the remedies which it provided, including taking possession of the property and receiving the rents and profits derived therefrom.

actions which paragraph 10 authorizes a trustee to make." It then concluded that Money-Code and Watson's modification of the First Trust Deed "cannot have a priority over the former lien and now ownership interest of [NSP]" because the modification materially prejudiced the junior lienholder, NSP. The trial court reasoned that "[NSP]'s ownership position (acquired at [the] foreclosure sale the day after the MoneyCode modification) is severely impacted if the [F]irst [T]rust [D]eed is changed from securing a revolving credit agreement with a maximum principal of $75,000 to a $1,23[0],000 loan" because NSP, "the new owner of the property," would be "holding property that would have little, if any, equity." After ruling that the First Trust Deed "d[id] not have a priority in the amount of $1,23[0],000" over the NSP Trust Deed, the trial court also granted NSP's request for an accounting from MoneyCode in order to determine whether the original $75,000 under the First Trust Deed had priority over the NSP Trust Deed.

¶ 10 In May 2005, Watson filed a motion for reconsideration, which the trial court denied. A few days later, MoneyCode filed an accounting as required by the summary judgment order.[4] Nearly a year later, NSP filed its "Motion to Approve Payment of the 1987 First Security Note, to Reconvey the 1987 Trust Deed and to Cancel MoneyCode's Notice of Default." The trial court granted NSP's motion, stating:

> [T]he payoff amount for the 1987 First Security Note is $80,479.51. Upon payment of the stated amount, together with interest to the date of payment, by [NSP] to MoneyCode, the 1987 First Security Note will be satisfied and paid in full; ... upon payment to MoneyCode, the trustee of the [First] Trust Deed ... is ordered to reconvey the [First] Trust Deed of record with the Utah County Recorder; ... Mon-

eyCode upon receipt of payment is ordered to cancel its Notice of Default. . . .

This appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶ 11 Watson argues that the trial court erroneously granted summary judgment in favor of NSP.[5] "We review a district court's grant of summary judgment for correctness and afford no deference to that court's legal conclusions." *Afridi v. State Farm Mut. Auto. Ins. Co.*, 2005 UT 53, ¶ 5, 122 P.3d 596.

## ANALYSIS

### I. The Modification Clause

■ ¶ 12 Watson argues that pursuant to the modification clause in the First Trust Deed, he and MoneyCode may modify the amount secured by the First Trust Deed-apparently without any limitation-and still retain priority over junior encumbrances, including the NSP Trust Deed. NSP, on the other hand, contends that Watson and MoneyCode created a new loan and not a mere modification when they increased the amount of the original obligation more than sixteen fold, from $75,000 to $1,230,000. We agree with NSP. In light of the principles of notice and reasonable reliance inherent in the nature and purpose of recording trust deeds, as well as a realistic reading of the terms "extension" and "modification," we conclude that the agreement between Watson and Money-Code, an assignee twice removed from First Security, is not a modification of the First Trust Deed but instead constitutes an entirely new loan that is subordinate both to the First Trust Deed and the NSP Trust Deed.

¶ 13 We begin our analysis by noting that the purpose of recording a trust deed is to provide notice of a security interest in the property to lenders, beneficiaries, or subsequent purchasers. *See* Utah Code Ann.

---

4. In its accounting, MoneyCode attempted to introduce evidence relating to a prior lawsuit between Watson and NSP that had been dismissed with prejudice. The trial court subsequently entered an order striking several documents submitted in support of MoneyCode's accounting.

5. Additionally, Watson appeals the order that denied his motion for reconsideration and revi-

sion of the summary judgment ruling, as well as the order that granted NSP's motion to approve payment, to reconvey the First Trust Deed, and to cancel MoneyCode's notice of default. Because our affirmance of the summary judgment ruling disposes of the other two orders, we do not address them separately in this opinion.

§ 57–3–102(1) (2000); *Boyer v. Pahvant Mercantile & Inv. Co.*, 76 Utah 1, 287 P. 188, 193 (1930); *Huffaker v. First Nat'l Bank of Brigham City*, 52 Utah 317, 173 P. 903, 904 (1918) ("It is conceded, as a legal proposition, that a conveyance made in trust and duly recorded is notice to all the world of [its] existence[.]"); *Larson v. Overland Thrift & Loan*, 818 P.2d 1316, 1323 (Utah Ct.App. 1991) ("Recording protects the beneficiaries of a trust deed against subsequent buyers by imparting notice[.]"), *cert. denied*, 832 P.2d 476 (Utah 1992). *Cf. Timm v. Dewsnup*, 2003 UT 47, ¶ 36, 86 P.3d 699 ("The purpose of strict notice requirements in a nonjudicial sale of property secured by trust deed is to inform persons with an interest in the property of the pending sale of the property, so that they may act to protect those interests.") (citation and internal quotation marks omitted). Thus, notice allows subsequent lenders to protect their interests by making loans based on what their financial position will be in relation to senior encumbrances. Stated another way, mortgage lenders are able to reasonably rely on previously recorded trust deeds to provide them with an estimate of what their financial position will be relative to other security interests in the same property. This principle is severely compromised, however, if Watson and MoneyCode are permitted to use the modification clause in the First Trust Deed to create an entirely new loan that will be secured by a trust deed senior to junior liens already then of record, without any notice to or consent of the junior lienholders.[6]

¶ 14 Furthermore, while it is unnecessary for us to attempt to definitively define the terms "extension" or "modification," a common sense reading of those terms simply does not support the conclusion that the MoneyCode loan was a mere modification of the obligation originally secured by the First Trust Deed. Nor is such a strained interpretation supported by real estate financing law principles. *See* Restatement (Third) of Property: Mortgages § 5.3 cmt. d, at 366 (1997) ("Some modifications may be so extreme that they impose fundamentally different risks on the transferor than those created by the original obligation.... In such cases the transferor is entirely discharged."); *Black's Law Dictionary* 622 (8th ed.2004) (defining "extension" as "[t]he continuation of the *same contract* for a specified period") (emphasis added). *Cf.* Robert Kratovil & Raymond J. Werner, *Modern Mortgage Law and Practice* § 38.04, at 551 (2d ed. 1981) ("The mere extension of the *time of payment* will not impair the priority of [an] extended mortgage. The benefit of this doctrine is watered down somewhat if the so-called extension agreement is made a vehicle for *more* than the mere extension of the time of payment.... [F]or example, ... an increase in the interest rate or additional principal indebtedness ... in the extension agreement will result in some loss of priority.") (emphasis added) (citations omitted); 1 Grant S. Nelson & Dale A. Whitman, *Real Estate Finance Law* § 9.4, at 891–92 (4th ed. 2002) ("Generally, [a modification resulting in] an increase in the mortgage interest rate or principal amount results in a *pro tanto* loss of priority to any intervening liens. On the other hand, courts sometimes suggest that

---

**6.** Watson contends that because the First Trust Deed contained a modification clause, junior lienholders such as NSP had notice that the obligations secured by the First Trust Deed could be modified and increased, "even in a manner that may prejudice the value of the junior lien holder's position." Accordingly, Watson argues, NSP could have protected its position by simply refusing to extend credit or requiring additional collateral from Watson. Because NSP did not take either of these actions, Watson insists that NSP "is bound by the terms of the prior recorded lien." We disagree.

In light of the language of the dragnet clause, we conclude that there is simply no way that NSP could have anticipated that Watson and MoneyCode would enter into a new loan-sixteen years later and in an amount more than sixteen times greater than originally agreed to-and then assert that the new loan had priority over the NSP Trust Deed. As is discussed in greater detail later in this opinion, the modification clause is necessarily limited by the language in the dragnet clause requiring that any modification "aris[e] pursuant to" or be "otherwise related or connected to" the original First Security Bank home equity loan secured by the First Trust Deed. Consequently, Watson's assertion that NSP had notice that the obligations secured by the First Trust Deed could be modified, and that it therefore should have acted accordingly to protect its interest, is unavailing because the new loan did not constitute a mere modification as contemplated in the First Trust Deed.

the modification can be so prejudicial that *complete* rather than *pro tanto* loss in priority is appropriate.... This sanction may also be called for where the increase in the senior mortgage obligation is so substantial that no equity whatsoever remains to secure junior liens.") (emphasis in original) (footnotes omitted); 4 Richard R. Powell, *Powell on Real Property* § 37.31, at 37–219 (Michael Allan Wolf ed., 2000) ("An extension that *merely alters the time period* for the payment of the obligation generally has no effect on the priority position of the extended mortgage as against intervening junior encumbrances. If, however, the extension *also affects the amount of principal to be paid,* ... the extended mortgage may lose priority as to the amount of the increased obligation.") (emphasis added) (footnotes omitted); Robert Kratovil & Raymond J. Werner, *Mortgage Extensions and Modifications,* 8 Creighton L.Rev. 595, 611 (1975) (noting that "an extension agreement which increases the amount of indebtedness is ineffectual as against subsequent encumbrances when the mortgage, as originally recorded, did not provide for such advances").

¶ 15 Watson originally gave First Security Bank the First Trust Deed to secure "a revolving credit line in the maximum principal sum of ... $75,000." Then, sixteen years later, Watson and MoneyCode attempted to "modify" the First Trust Deed to secure a new loan-totally unrelated to the original transaction-of more than a million dollars. Certainly such a "modification" is "so extreme that [it] impose[s] fundamentally different risks on the [junior lienholder] than those created by the original obligation." Restatement (Third) of Property: Mortgages § 5.3 cmt. d, at 366 (1997). Accordingly, we conclude that when Watson entered into a new loan with a new lender, in an amount more than sixteen times greater than the original $75,000 home equity line of credit, this action was so far afield from the original agreement under the First Trust Deed that the new loan simply cannot be read as a mere "extension" or "modification" as those terms are commonly used.

## II. Applicability of Restatement

■ ¶ 16 Watson and NSP agree that section 7.3 of the Restatement (Third) of Property: Mortgages accurately summarizes the law that should govern their dispute. They disagree, however, on whether subsection (b) or subsection (c) applies to the modification clause and NSP's junior interest in Hobble Creek. Watson argues that subsection (c) should govern because his agreement with MoneyCode was specifically drafted pursuant to the modification clause, not the dragnet clause. And, based on subsection (c), Watson asserts that the modified agreement has priority because the modification clause in the original documentation allows subsequent modifications even when a junior lienholder will suffer material prejudice, because the parties included a contractual reservation of the right to modify. *See* Restatement (Third) of Property: Mortgages § 7.3(c) (1997).

¶ 17 NSP, on the other hand, contends that the dragnet clause limits the modification clause and that the two provisions must be read together. Therefore, NSP argues, subsection (b) governs because the modification or new loan fell outside the scope of the modification clause, as properly interpreted, and materially prejudiced NSP. *See id.* § 7.3(b). Again, we agree with NSP.

¶ 18 Pursuant to general principles governing the interpretation of written instruments, the First Trust Deed must be read as a whole. *See Bank of Ephraim v. Davis,* 559 P.2d 538, 540 (Utah 1977) ("A mortgage is governed by the same rules of interpretation that apply to written instruments generally."); *Johnson v. Morton Thiokol, Inc.,* 818 P.2d 997, 1003 (Utah 1991) (stating that under "traditional rules of contract interpretation," a contract should be interpreted as a whole, "harmonizing all of the provisions"). Accordingly, in light of the limiting language contained in the First Trust Deed's dragnet clause, we conclude that the trial court correctly relied on the Restatement's subsection (b), which states:

If a senior mortgage or the obligation it secures is modified by the parties, the mortgage as modified retains priority as against junior interests in the real estate,

except to the extent that the modification is materially prejudicial to the holders of such interests and is not within the *scope of a reservation of right* to modify as provided in Subsection (c).

Restatement (Third) of Property: Mortgages § 7.3(b) (1997) (emphasis added). The First Trust Deed did not reserve the right to substitute, as the obligation secured by the First Trust Deed, a new loan with a new lender in an unlimited amount. On the contrary, the dragnet clause specifically provides, with our emphasis, that the First Trust Deed's purpose is to secure

> payment of all obligations now or hereafter arising *pursuant to or otherwise related or connected to that certain* "First Security Home Equity Line Agreement, Note, and Disclosure Statement" of even date herewith executed by the Trustor. . . .

¶ 19 Thus, the dragnet clause specifically provides that the First Trust Deed will secure future obligations "arising pursuant to or otherwise related or connected to" the original First Security Bank home equity loan. Moreover, the modification clause in paragraph 10 does not expand upon what the First Trust Deed secures but rather simply sets forth a number of duties the trustee will fulfill at the written request of the beneficiary. Accordingly, when read as a whole, the dragnet clause clearly limits "the scope of [the] reservation of right to modify," in paragraph 10, bringing the modification clause within the purview of Restatement subsection (b). Restatement (Third) of Property: Mortgages § 7.3(b). Accordingly, because MoneyCode's subsequent loan did not "aris[e] pursuant to" and was not "otherwise

related" to the home equity loan originally secured by the First Trust Deed, and because the subsequent loan is "materially prejudicial" to NSP,[7] we conclude that it does not have priority over the NSP Trust Deed.[8]

## CONCLUSION

¶ 20 We conclude that when Watson and MoneyCode, a new lender, entered into a new loan in an amount more than sixteen times greater than the original $75,000 home equity line of credit, that action was so remote from the original agreement that the new loan simply cannot be read as a mere extension or modification of the obligation secured by the First Trust Deed. Furthermore, we conclude that under the limiting language of the dragnet clause, the new loan was not related to, nor did it arise pursuant to, the First Trust Deed. Accordingly, section 7.3(b) of the Restatement (Third) of Property: Mortgages is applicable. If the new loan were deemed to be secured by the First Trust Deed, material prejudice would result to NSP. Therefore, the new loan does not have priority over NSP's position.

¶ 21 Affirmed.[9]

¶ 22 WE CONCUR: RUSSELL W. BENCH, Presiding Judge and PAMELA T. GREENWOOD, Associate Presiding Judge.

---

7. We concur with the district court's conclusion in its summary judgment ruling:

> It is beyond question that [NSP]'s ownership position ... is severely impacted if the [First Trust Deed] is changed from securing a revolving credit agreement with a maximum principal of $75,000 to a $1,23[0],000 loan.... If this is not a material prejudice to the junior interest, [the court] simply cannot conceive of what the phrase "material prejudice" must mean.

8. In its ultimate ruling, the trial court ordered NSP to pay MoneyCode $80,479.51—the amount the court determined was attributable to the original home equity loan secured by the First Trust

Deed, which the trial court concluded retained its priority over the NSP Trust Deed. NSP did not cross-appeal these determinations.

9. NSP requests attorney fees and costs incurred in defending this appeal, arguing that Watson failed to properly cite to the record as required by rule 24 of the Utah Rules of Appellate Procedure. *See* Utah R.App. P. 24(a)(7). Watson filed a motion to amend his brief to comply with rule 24 and tendered a brief that complies with the rule. We deferred ruling on that motion. We now grant the motion, accept the corrected brief, and deny NSP's request for an award of fees and costs.