**2018 UT App 231**

# THE UTAH COURT OF APPEALS

TRAPNELL & ASSOCIATES LLC,
Appellant,
*v.*
LEGACY RESORTS LLC, JAX PETTEY, AND
AMERICA FIRST CREDIT UNION,
Appellees and Cross-appellants,
*v.*
PRAIA LLC AND TRAPNELL & ASSOCIATES LLC,
Cross-appellees

Opinion
No. 20160716-CA
Filed December 20, 2018

Fourth District Court, Heber Department
The Honorable Samuel D. McVey
No. 140500081

Matthew G. Grimmer and Jacob R. Davis, Attorneys
for Appellant and Cross-appellees

Mark R. Gaylord and Zaven A. Sargsian, Attorneys
for Appellees and Cross-appellants,
America First Credit Union

David M. Wahlquist, Peter C. Schofield, Rod N.
Andreason and Justin Starr, Attorneys for Appellees
and Cross-appellants, Legacy Resorts, LLC

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1      In August 2010, Legacy Resorts, LLC (Legacy), one of the creditors of the Zermatt Resort (Zermatt) in Midway, Utah, foreclosed on the Zermatt property, which sold at a trustee's sale for $14.5 million. Because the note associated with the trust deed

being foreclosed had an outstanding balance of $17.2 million, the trustee credited the entire $14.5 million to the noteholder. Four years later, another creditor (Praia, LLC (Praia), the predecessor-in-interest of Appellant Trapnell & Associates, LLC (Trapnell)) sued, claiming that it had at least partial priority over the foreclosing noteholder, and that it should have been paid at least $9.8 million from the 2010 sale proceeds. In a series of rulings, the district court rejected Praia's claims, dismissed its lawsuit, and entered judgment against it.

¶2    Soon after the district court entered its final judgment against Praia, Trapnell filed a "Notice of Substitution," notifying the court that it was Praia's "assignee" and was "the real party in interest who shall prosecute this action." That same day, Trapnell—and not Praia—filed a notice of appeal, purporting to appeal the district court's final judgment and subsidiary orders. After a remand to consider whether Praia should be given extra time to file its own notice of appeal, the district court ruled that there was no need for Praia to be given extra time to appeal, because Trapnell had "already . . . substituted in as the real party in interest" and "[i]ts rights are now Trapnell's," and that the court's intent in previously denying Praia's request for additional time was "that Trapnell as the real party in interest could raise any issue on appeal Praia could have raised."

¶3    Both sides appeal certain decisions of the district court. Trapnell appeals the court's rejection of Praia's claim regarding division of the foreclosure sale proceeds. Legacy appeals the court's determination that Trapnell had properly substituted in as the real party in interest; Legacy maintains that no such substitution was ever properly effected, and that because Praia (as opposed to Trapnell) failed to file a timely notice of appeal, this court lacks jurisdiction to adjudicate Trapnell's appeal.

¶4    For the reasons set forth herein, we conclude that we have jurisdiction to consider Trapnell's appeal. On the merits, however, we conclude that the district court's decision to reject

Praia's claim regarding the division of foreclosure sale proceeds was correct, and therefore affirm.

BACKGROUND

¶5     In order to get its development off the ground, Zermatt needed funding, and it obtained that funding by taking out a series of large loans from various creditors. First, in 2005, George W. Perkins, Jr. (Perkins) loaned Zermatt $6 million, secured by a trust deed on the Zermatt property. A year later, in 2006, Zermatt obtained a second loan, this time for $16.5 million, from America First Credit Union (AFCU). This loan was also secured by a trust deed on the Zermatt property. At about the same time AFCU made this second loan, AFCU and Perkins entered into a subordination agreement in which Perkins agreed to subordinate his interest in the property to AFCU's interest.

¶6     By 2009, Zermatt was struggling to meet its obligations under the first two loans, and both Perkins and AFCU had filed notices of default. Zermatt and AFCU worked together to address the situation. First, some of the individuals affiliated with Zermatt formed a new entity (Legacy), and in 2010 AFCU agreed to loan an additional $12.5 million to this new entity, secured by a trust deed on the Zermatt property. Legacy used the proceeds from the new $12.5 million loan to purchase AFCU's 2006 note and trust deed, thereby succeeding to AFCU's interests on that loan. Legacy then agreed to subordinate its position to AFCU's new position, thus subordinating its newly-acquired $16.5 million interest to AFCU's new $12.5 million interest. Perkins was not a party to this second subordination agreement. After this transaction was completed, Perkins's $6 million interest remained subordinated to Legacy's (formerly AFCU's) $16.5 million interest, while Legacy's interest was in turn subordinated to AFCU's $12.5 million interest.

¶7     Legacy then foreclosed on its newly-purchased loan (AFCU's interest from 2006), which remained in default. By the time of foreclosure, Legacy's interest had grown from $16.5

million to approximately $17.2 million. Legacy auctioned the property at a trustee's sale on August 9, 2010, having first published notice of the sale in public newspapers and mailed notice directly to Perkins and AFCU. The highest bidder at the auction was Legacy itself, which made a $14.5 million credit bid. The trustee credited Legacy's bid amount against the amount it was owed and, because the credit bid amount ($14.5 million) was less than the outstanding amount on the loan Legacy was foreclosing ($17.2 million), in Legacy's view there were no excess proceeds to distribute to junior creditors. The trustee then transferred title to the property to Legacy by means of a trustee's deed. The foreclosure sale had the effect of extinguishing the trust deed being foreclosed (Legacy's), as well as all trust deeds junior thereto, including Perkins's. All parties agree, however, that AFCU's new $12.5 million lien was senior to Legacy's interest, and was not extinguished by Legacy's foreclosure. AFCU did not foreclose on that loan, and instead retained its $12.5 million interest in the form of a lien on the foreclosed property. That is, Legacy purchased the property at the trustee's sale, but took the property subject to AFCU's $12.5 million lien.

¶8    Over the next few years, a series of transactions resulted in Perkins's now-extinguished interest being transferred to Praia. On August 8, 2014, Praia[1] filed a lawsuit against Legacy and AFCU, alleging that Perkins had been "entitled to a portion of the foreclosure sale proceeds" that had been credited to Legacy.

¶9    Legacy/AFCU and Praia each filed cross-motions for summary judgment, and stipulated to many of the material facts. In their motion, Legacy and AFCU argued that Perkins had not been entitled to any proceeds from the foreclosure sale because

---

1. The lawsuit was actually filed by Kenneth Patey, a predecessor-in-interest to Praia. By order dated November 16, 2015, Praia was substituted into the lawsuit—without opposition—in place of Patey. For simplicity's sake, however, in this opinion we refer to the lawsuit as having been filed by Praia.

his interest was subordinated to approximately $17.2 million of higher-priority interests, and the sale proceeds were only $14.5 million. In response, Praia argued that, "because a portion of Legacy's [interest] was subordinated" to AFCU's new interest, Legacy was only entitled to keep roughly $4.7 million of the sale proceeds (the difference between Legacy's total $17.2 million interest and AFCU's new $12.5 million interest), and that Perkins was entitled to the remainder.

¶10    After full briefing and oral argument, the district court agreed with Legacy and AFCU, and determined that Perkins had intended for his position to be subordinated to Legacy's $16.5 million (now $17.2 million) position, and that this subordination was not affected by AFCU's decision not to foreclose on its new $12.5 million interest that was senior to Legacy's. The court concluded that "there were never enough funds to pay anything to [Perkins] after satisfying the $16.5 million position [that Perkins] was always behind," and that "[t]he amount of the bid, $14.5 million, cannot satisfy the $16.5 million position and still have anything left over." In keeping with this ruling, the district court eventually entered a final order dismissing Praia's claims.

¶11    At some point prior to this appeal, Praia assigned its interest in the Perkins loan to Trapnell. After the district court entered final judgment against Praia on Praia's claims, Trapnell filed a "Notice of Substitution of Real Party in Interest" indicating that Praia had assigned its claims to Trapnell and declaring that, "pursuant to Rule 17 of the Utah Rules of Civil Procedure," Trapnell was "the real party in interest who shall prosecute this action." On the same day as it filed its "Notice of Substitution," Trapnell filed a notice of appeal indicating that it, as "assignee of the claims brought by Praia," would be appealing the district court's final judgment and subsidiary decisions.

¶12    Legacy and AFCU then asked this court to summarily dispose of Trapnell's appeal, arguing that Trapnell had not followed the proper procedures to become a party to the case, and asserting that this court did not have jurisdiction to hear an

appeal from an entity that had never properly been a party to the district court case. Trapnell filed a substantive opposition to the motion in this court. At the same time, Praia moved separately in the district court for an extension of time to file its own notice of appeal, which request Legacy and AFCU opposed. The district court denied Praia's motion for an extension of time, noting that "the final order in this case has already been appealed and is before the Court of Appeals." Praia appealed this decision, and this court summarily reversed and remanded, interpreting the district court's ruling as having been made on jurisdictional grounds, and instructing the district court that it had jurisdiction to consider Praia's motion for an extension of time to file an appeal. A few days later the district court entered an order, on remand, again denying Praia's motion for an extension of time, this time explaining that it considered any extension "unnecessary" due to its view that "Trapnell had already . . . substituted in as the real party in interest as allowed by rule 17(a) of the Utah Rules of Civil Procedure." The district court stated that, due to Trapnell's substitution, "there is no reason to consider Praia as an entity required to file its own subsequent notice of appeal" because "[i]ts rights are now Trapnell's." The court further stated that its intent in denying Praia's motion the first time was "that Trapnell as the real party in interest could raise any issue on appeal Praia could have raised."

¶13   Legacy and AFCU now appeal that ruling, while Trapnell appeals the court's dismissal, on its merits, of Praia's claim regarding the division of foreclosure sale proceeds.

## ISSUES AND STANDARDS OF REVIEW

¶14   In their cross-appeals, the parties ask us to consider two main issues.[2] First, Legacy and AFCU contend that Trapnell did

_____

2. Legacy and AFCU also contend that Trapnell waived its arguments on the merits and is thus estopped from making them here, and also that Trapnell's lawsuit was filed too late to satisfy

(continued…)

not properly substitute for Praia as the real party in interest in this case, and that the district court erred when it purported to recognize such a substitution. Whether a district court correctly interpreted a rule of procedure presents a question of law, which we review for correctness. *Peterson v. Jackson*, 2011 UT App 113, ¶ 13, 253 P.3d 1096. If the district court erred, Legacy further contends that we do not have appellate jurisdiction in this case. "Whether appellate jurisdiction exists is a question of law . . . ." *Butler v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints*, 2014 UT 41, ¶ 15, 337 P.3d 280.

¶15 Second, Trapnell contends that the district court erred when it determined that Perkins (and, by extension, Praia and Trapnell) was not entitled to any of the proceeds resulting from Legacy's foreclosure sale, and upon that basis dismissed Praia's claim. When reviewing a district court's grant of summary judgment, we review "the facts and all reasonable inferences drawn therefrom" in the light most favorable to the nonmoving party. *Massey v. Griffiths*, 2007 UT 10, ¶ 8, 152 P.3d 312 (quotation simplified). We then review for correctness "the district court's legal conclusions and ultimate grant or denial of summary judgment." *Id*.

ANALYSIS

I

¶16 We must first determine whether we have jurisdiction to adjudicate Trapnell's appeal. Legacy and AFCU assert that Trapnell—the only entity to file a timely notice of appeal—is not

_____

(…continued)
what they contend is the applicable statute of limitations. Because we determine that the district court correctly dismissed Praia's claim on its merits, we need not address whether that claim was also barred by the applicable statute of limitations or by the doctrines of waiver or estoppel.

and never has been a proper party to this case. We conclude that, while the procedures set forth by rule were not perfectly followed, under the unique circumstances of this case Trapnell is a proper party to the underlying case, and therefore we have jurisdiction to consider its appeal.

¶17　Legacy and AFCU are correct when they point out that—as a general matter, and in the absence of an extraordinary writ—nonparties are "not entitled to appeal" a lower court's decision. *See Utah Down Syndrome Foundation, Inc. v. Utah Down Syndrome Ass'n*, 2012 UT 86, ¶ 9, 293 P.3d 241 (stating that "persons or entities that are not parties to a proceeding are not entitled to an appeal as of right," and that "an extraordinary writ is the vehicle pursuant to which nonparties can properly challenge a court order" (quotation simplified)). An appellate court has no jurisdiction to consider a direct appeal from a nonparty. *Id.* ¶ 12 (stating that "where an appeal is not properly taken, this court lacks jurisdiction and we must dismiss" (quotation simplified)). Legacy and AFCU thus frame the question properly: if Trapnell was never a proper party to the district court lawsuit, it has no right—absent an extraordinary writ—to challenge a decision of the district court, and we would have no authority to take any action with regard to Trapnell's appeal other than to dismiss it.

¶18　In support of their argument that Trapnell was never properly made a party, Legacy and AFCU direct our attention to rule 25 of the Utah Rules of Civil Procedure. That rule states, in relevant part, that when one party transfers its interest to another "the action may be continued by or against the original party, unless the court *upon motion* directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." Utah R. Civ. P. 25(c) (emphasis added). The rule further provides that any such motion is to be served on all of the parties. *See id.* (stating that "[s]ervice of the motion shall be made as provided in Subdivision (a) of this rule"); *id.* R. 25(a)(1) (stating that the motion shall be served "on the parties as

provided in Rule 5"). Legacy and AFCU correctly point out that Trapnell did not strictly comply with these requirements.

¶19    Rather than file a "motion" invoking rule 25(c), Trapnell instead filed a "notice"—which it did properly serve on all parties in a manner that satisfied rule 5—invoking rule 17, which simply states that "[e]very action shall be prosecuted in the name of the real party in interest." Utah R. Civ. P. 17(a). Trapnell's notice proclaimed that Trapnell had acquired Praia's interests, and identified itself as "the real party in interest who shall prosecute this action." If the matter had ended there, with no further action taken by either Trapnell or the district court, we would agree with Legacy and AFCU that Trapnell had not been properly substituted into the case. Indeed, an entity not originally part of a lawsuit cannot simply declare itself to be a substituting or intervening party to a lawsuit. *See Lundahl v. Quinn*, 2003 UT 11, ¶ 10, 67 P.3d 1000 (stating that "courts cannot be compelled to recognize a substitution of parties at the whim of the movant"). In *Lundahl*, our supreme court refused to recognize a person as a party to the case, even though that person had made numerous filings in the case, because the district court refused to allow the person to intervene in the case, and because the person had never asked to be substituted into the case pursuant to rule 25. *Id*. ¶ 12 (stating that "the district court's justifiable refusal to address a multitude of last-ditch, disruptive legal filings was well within its discretion and supported by [the person's] failure to avail herself of the procedural rule designed to afford her the relief she claimed").

¶20    What makes this case different from *Lundahl* is that, in this case, the district court twice approved Trapnell's participation in the case. First, in a ruling made on September 29, 2016, the district court denied Praia's motion for an extension of time to file its own notice of appeal, because the "case has already been appealed and is before the Court of Appeals." The district court, in a later ruling, stated that its "intent" in denying Praia's original motion for additional time to appeal was that it considered Trapnell to have been properly substituted into the

case for Praia and because Trapnell therefore "could raise any issue on appeal that Praia could have raised." Second, in that later ruling made after remand, the district court expressly recognized Trapnell as a substituted party, stating repeatedly that Trapnell had already "substituted in as the real party in interest" and "now stands in place of Praia" because it had "been assigned all of . . . Praia's claims." The district court made these statements after receiving a filing—properly served on all other parties—in which Trapnell clearly signaled its intent to be substituted into the case for Praia.

¶21 Legacy and AFCU, however, identify two problems with the procedure followed by the district court, and ask us to reverse the district court's recognition of Trapnell as the substituted party on those grounds. First, they point out that Trapnell filed a "notice" and not a "motion" as rule 25(c) requires. We are unpersuaded by this argument. Generally speaking, and with certain exceptions, the caption of a filing is not necessarily dispositive of its substance. *See Armstrong Rubber Co. v. Bastian*, 657 P.2d 1346, 1348 (Utah 1983) (noting that "[i]f the nature of the motion can be ascertained from the substance of the instrument, we have heretofore held than an improper caption is not fatal to that motion"); *DeBry v. Fidelity Nat'l Title Ins. Co.*, 828 P.2d 520, 523 (Utah Ct. App. 1992) (stating that "[t]he substance of a motion, not its caption, is controlling"). If the district court eventually authorizes the substitution, it does not matter that the filing that triggered that authorization is captioned as a "notice" rather than as a "motion."

¶22 Second, and more substantively, Legacy and AFCU assert that they were prejudiced by the procedure that the district court employed in recognizing Trapnell as the substituted party. Specifically, they claim that they were never afforded an opportunity to respond to or independently verify Trapnell's claim that it was in fact Praia's assignee, and they claim they would have had that opportunity had Trapnell filed a motion instead of a notice. While, as noted, we certainly acknowledge it would have been better had Trapnell filed a motion invoking

rule 25(c) instead of a notice invoking rule 17, the intent of Trapnell's filing was clear—it wished to be recognized as the real party in interest so that it could prosecute the appeal in Praia's stead. We discern no reason—and neither Legacy nor AFCU offer one—why Legacy or AFCU could not have filed a memorandum opposing Trapnell's assertion that it was a properly-substituted party, either in August 2016 right after Trapnell made its filing, or in September 2016 during the litigation over Praia's motion for additional time, or in December 2016 after this court remanded the case and the district court issued its follow-up ruling recognizing Trapnell as the real party in interest. Moreover, neither Legacy nor AFCU (nor, significantly, Praia, who one would think would be the party with the most incentive to object) has come forward, either here or in the district court, with any indication that Trapnell is not actually Praia's assignee.

¶23 Under the unique circumstances of this case, we see no reason to disturb the district court's recognition of Trapnell as the real party in interest and Praia's assignee. This is not a case—like *Lundahl*—in which an entity never recognized by the district court as a party was making repeated and unauthorized wild filings. *See Lundahl*, 2003 UT 11, ¶¶ 10–12. And this is not a case in which we perceive the imposition of any meaningful limitations on any party's right to be heard on the question of whether Trapnell is properly a party to the case. The district court, after receiving a written filing served on all parties, recognized Trapnell as the real party in interest. We decline Legacy's and AFCU's invitation to reverse the district court's determination under these circumstances. Accordingly, Trapnell was made a party to the case below, and we have jurisdiction to consider its appeal of the district court's substantive decisions.

II

¶24 Having determined that we have jurisdiction to hear Trapnell's appeal, we now turn to its merits, which present us with an issue of circular lien priorities. We first discuss circular

lien priorities generally, and then explain why the principles governing circular lien priorities compel us to affirm the district court's conclusion that Perkins was not entitled to share in the foreclosure sale proceeds.

¶25     An issue of circular lien priorities arises "where there are at least three creditors who hold an interest in the same property and fewer than all of those creditors enter into a subordination agreement." *See VCS, Inc. v. Countrywide Home Loans, Inc.*, 2015 UT 46, ¶ 20, 349 P.3d 704. In the typical circular lien situation, A has priority over B, and B has priority over C, but (due to a separate subordination agreement between A and C) C has priority over A.

¶26     Courts facing such situations have generally taken one of two approaches. The first is known as "complete subordination," in which A is deemed—by virtue of its agreement to subordinate itself to C—to have placed itself at the back of the line, thereby elevating B to the first-place position, even though B was not a party to the subordination agreement between A and C. *See id.* ¶ 26 & n.15. The second is known as "partial subordination," which is more complex but also more equitable than complete subordination. Under that approach, assuming all three creditors are interested in foreclosing, the "proper distribution of the fund" comprising the foreclosure sale proceeds is to first "set aside from the fund the amount of A's claim," and then out of that money "pay C the amount of its claim," and then "pay A to the extent of any balance remaining after C's claim is satisfied." *Id.* ¶ 25 (quotation simplified). After that, B should be paid "the amount of the fund remaining after A's claim has been set aside," up to the total amount of B's claim. *Id.* (quotation simplified). Finally, "if any balance remains in the fund after A's claim has been set aside and B's claim has been satisfied," the balance should be distributed to C and A. *Id.* (quotation simplified). In summary,

C, by virtue of the subordination agreement, is paid first, but only to the amount of A's claim, to which B was in any event junior. B receives what it had expected to receive, the fund less A's prior claim. If A's claim is smaller than C's, C will collect the balance of its claim, in its own right, only after B has been paid in full. A, the subordinator, receives nothing until B and C have been paid except to the extent that its claim, entitled to first priority, exceeds the amount of C's claim, which, under its agreement, is to be first paid.

*Id.* (quotation simplified). Partial subordination is "the approach subscribed to by a majority of jurisdictions," and it is the one our supreme court adopted in *VCS*. *Id.* ¶¶ 25, 36.[3]

¶27 This case presents a circular lien priority scenario: Legacy has priority over Perkins (due to a subordination agreement between them), Perkins has priority over AFCU's new interest (due to the timing of the recording of the respective trust deeds), and AFCU's new interest has priority over Legacy (due to a subordination agreement between them). *VCS* therefore contains clear instructions as to how the sale proceeds should have been divided had all of the creditors—including AFCU on its new loan—elected to foreclose. Under that scenario, Legacy would be in the A position, Perkins in the B position, and AFCU in the C position. The first $17.2 million—the amount of Legacy's claim—was to have been set aside, but since only $14.5 million was realized at the sale, that $14.5 million would have been set aside. And out of that $14.5 million, AFCU would have been paid $12.5

---

3. When Praia first filed this suit, our supreme court had not yet decided *VCS*, and Praia—the party in the B position—was hoping for the application of "complete subordination," which arguably would have put it at the front of the line. Unfortunately for Praia, during the pendency of its lawsuit our supreme court adopted the "partial subordination" approach instead.

million (the full amount of its claim), and Legacy would have been paid $2 million (the remaining amount). Perkins would have gotten nothing.

¶28    The difference between this case and the usual "circular lien priority" situation (e.g., *VCS*) is that, in this case, the creditor in the C position (AFCU) did not foreclose its lien. Trapnell—the successor-in-interest to Perkins's position—argues that, in such a situation, AFCU's $12.5 million interest should still be subtracted from Legacy's share of the "set aside" amount, but not considered "paid," so that the sale proceeds end up being distributed like this:

| Priority of Liens | Proceeds Paid |
| --- | --- |
| AFCU: $12.5 million | None paid (not foreclosed) <br><br> $12.5m interest remains |
| Legacy (partial): $4.7 million | $4.7 million paid |
| Perkins: $13.5 million | $9.8 million paid |
| Legacy (remainder): $12.5m | None left over |

Trapnell maintains that, without accounting for the proceeds in this manner, Perkins will effectively be subordinated to both Legacy's $17.2 million interest and AFCU's new $12.5 million interest, and that accounting for the proceeds in the way it advocates is the only way to prevent Perkins from ending up subordinated "to an amount much larger than the amount to which Perkins agreed to subordinate." Legacy and AFCU resist this contention, pointing out that Perkins agreed to be subordinate to $17.2 million worth of debt, and assert that

Perkins could never receive any recovery from the sale "unless the winning bid was more than what Legacy was owed." In our view, Legacy and AFCU have the better of the argument.

¶29   Utah statutory law provides that the proceeds of a trustee's sale should be applied first to the costs and expenses associated with the sale and second to "payment of the obligation secured by the trust deed" being foreclosed. *See* Utah Code Ann. § 57-1-29(1)(a)(i–ii) (LexisNexis Supp. 2018). Because AFCU did not foreclose on its new $12.5 million interest, the trust deed being foreclosed was Legacy's, and that interest was $17.2 million at the time of the foreclosure. The trustee simply followed the statutory mandate when it credited the entire $14.5 million credit bid to Legacy's trust deed—the one being foreclosed—rather than to AFCU's new interest that was not being foreclosed.

¶30   Indeed, because the entirety of AFCU's interest[4] was senior to the deed being foreclosed, that interest remained attached to the property even after Legacy's foreclosure sale. "A valid foreclosure of a mortgage terminates all interests in the foreclosed real estate that are junior to the mortgage being foreclosed," but "[f]oreclosure does not terminate interests in the foreclosed real estate that are senior to the mortgage being foreclosed." Restatement (Third) of Property (Mortgages) § 7.1

---

4. Presumably, a slightly different scenario would present itself if AFCU's new interest had been larger than Legacy's interest. Under partial subordination, AFCU's new interest is in first position only to the extent that it is equal to or smaller than Legacy's interest. Had AFCU's interest been $20 million, only $17.2 million would have been in first position, with the remaining $2.8 million in the C position behind Perkins. *See*, *e.g.*, *Atlantic Trustee Services, L.L.C. v. Cortez*, 2018 WL 1123899, *6, No. CL-2017-8414 (Va. Cir. Ct. 2018) (stating that the creditor in the A position "can only subordinate its . . . loan to" a loan in the C position "to the extent of the lesser of the two loans").

(Am. Law Inst. 1999); *see also Nature's Sunshine Products, Inc. v. Watson*, 2007 UT App 383, ¶ 5, 174 P.3d 647 (stating that a buyer at a foreclosure sale purchased the property "subject to the rights of any senior lienholders of record"); Restatement (Third) of Property (Mortgages) § 7.1 cmt. a (stating that "the title deriving from a foreclosure sale, whether judicial or by power of sale, will be subject to all mortgages and other interests that are senior to the mortgage being foreclosed"); *id.* § 7.4 cmt. c (stating that liens senior to the foreclosing lien "are unaffected by foreclosure and remain on the foreclosed real estate" and that therefore senior lienholders "remain free to foreclose on the real estate" even after the foreclosure sale regarding the junior lien). Because unforeclosed senior liens remain attached to the property after the foreclosure sale, the holders of such liens have no claim to any of the funds generated by a foreclosure sale regarding a junior lien, even if there is a surplus. *See* Restatement (Third) of Property (Mortgages) § 7.4 cmt. c (1997) (stating that "[s]enior lienors have no lien claim to a surplus produced by the foreclosure of a junior mortgage").

¶31    If AFCU had foreclosed on its interest, pursuant to the "partial subordination" principles adopted in *VCS*, *see VCS*, 2015 UT 46, ¶ 25, it would have been entitled to the first $12.5 million of the sale proceeds pursuant to Legacy's agreement to subordinate its interest to AFCU's new interest. But AFCU did not foreclose, and chose instead to allow its senior lien to remain on the property even after Legacy purchased it at the foreclosure sale. In this manner, AFCU's interest is still honored and accounted for, even if it is not included in the calculation of how to disburse the foreclosure sale proceeds, because AFCU even today retains the right to foreclose on the property in the event of default. Assuming, hypothetically, that the property was actually worth exactly $14.5 million at the time of the trustee's sale, Legacy purchased only a $2 million equity interest, because Legacy's title is subject to AFCU's lien.

¶32    Moreover, adopting Trapnell's position would result in Trapnell receiving a windfall. *See id.* ¶ 20 (stating that one of the

virtues of the "partial subordination" approach is that it "prevents nonparty creditors . . . from obtaining a windfall"). Perkins's interest was junior to Legacy's interest, even before Legacy agreed to subordinate its interest to AFCU's. Thus, in the absence of the 2010 subordination agreement between Legacy and AFCU, Perkins would have recovered nothing in the event Legacy foreclosed and the sale yielded only $14.5 million. Trapnell has identified no reason that the existence of the 2010 subordination agreement—to which Perkins was not even a party—should change the result from Perkins's perspective.

¶33   As our supreme court noted, "the central question in cases of circular lien priorities is what the parties intended" in entering into their subordination agreements. *See id.* ¶ 27. In this case, Perkins entered into an agreement voluntarily subordinating his position to the interest that eventually became Legacy's. Indeed, Trapnell concedes, as it must, that Perkins intended to subordinate his interest to Legacy's, and that it was therefore subordinate to "interests total[ing] $17.2 million." Regardless of how that $17.2 million interest is divvied up between Legacy and AFCU, Trapnell "was in any event junior" to that entire position. *See id.* ¶ 25 (quotation simplified). Because only $14.5 million was realized from the foreclosure sale, there is nothing left over to even partially satisfy Trapnell's junior position. Placing Trapnell behind the entire $17.2 million Legacy interest is entirely in keeping with the intent of the parties that entered into the 2006 subordination agreement.

¶34   And it is not unfair to Trapnell (or to any other party) to decline to subtract AFCU's $12.5 million interest from the calculation of the amount Legacy is entitled to keep. AFCU would have had the right—had it also foreclosed on its lien—to be paid first from the proceeds of Legacy's foreclosure sale, by reason of its subordination agreement. It opted not to exercise that right, and elected to take its chances that it could be paid in the future from a different source of funds (either by Legacy paying back the loan as agreed upon, or from funds generated in a future foreclosure sale). Because AFCU chose not to claim any

of the funds generated by Legacy's foreclosure sale, there is no reason to subtract its $12.5 million interest from the total amount of funds available to pay Legacy and other junior creditors.

¶35   This result does not, as Trapnell argues, place Perkins's interest behind more than $29 million worth of interests. Perkins was not, and has never been, behind AFCU's new $12.5 million interest (at least not if that interest is considered separately from Legacy's). Perkins had the right—ahead of AFCU—to recover any surplus from the foreclosure sale that exceeded $17.2 million. *See id.* ¶ 25 (stating that "C will collect the balance of its claim, in its own right, only after B has been paid in full" (quotation simplified)). Indeed, even Legacy and AFCU acknowledge that, had more than $17.2 million been recovered at the foreclosure sale, the first $13.5 million over and above Legacy's $17.2 million interest would have gone to Perkins, and not to AFCU. The Perkins interest was only ever behind $17.2 million in liens, and the fact that AFCU's nonforeclosed lien remains on the property does not change that fact. As Legacy points out in its brief, "[t]he agreement between AFCU and Legacy did not place Perkins behind both AFCU and Legacy; he was only behind Legacy while Legacy alone had an obligation to give AFCU priority to some of what Legacy received."[5]

---

5. Because it was not foreclosing on its trust deed, AFCU as senior lienholder was not entitled to make any direct claim on the corpus of funds generated by Legacy's foreclosure sale. However, pursuant to the terms of its previous subordination agreement with AFCU, Legacy *did*, in a sense, share the benefit of the foreclosure sale with AFCU by purchasing the property subject to AFCU's pre-existing senior lien. No matter how high the sale price ended up being, AFCU retained a future entitlement—by virtue of its senior lien—to foreclose on the property in the event of a default in the obligations secured by its lien, and recover up to $12.5 million. If Perkins felt like the price bid at Legacy's foreclosure sale was too low, he could have

(continued…)

¶36 Accordingly, we conclude that, under the principles of "partial subordination" set forth in *VCS*, Perkins (the party in the B position in the *VCS* hypothetical) was not entitled to recover anything from the foreclosure sale unless the sale yielded more than $17.2 million—the amount to which Perkins voluntarily subordinated his interest. This result holds true even where, as here, AFCU (the party in the C position) did not foreclose on its lien. Because the foreclosure sale yielded only $14.5 million, Perkins was not entitled to receive any of the proceeds of the sale. Legacy was appropriately credited with those funds, subject to its own separate obligation to share those funds with AFCU in a manner satisfactory to Legacy and AFCU and consistent with those parties' separate subordination agreement.

## CONCLUSION

¶37 Under the unique circumstances of this case, Trapnell was a proper party to the case and therefore may take a direct appeal from the district court's final order. We therefore have jurisdiction to consider the merits of Trapnell's appeal. On its merits, however, Trapnell's appeal fails, because Perkins was not entitled to any portion of the $14.5 million proceeds from the 2010 foreclosure sale.

¶38 Affirmed.

_____

(…continued)
appeared at the sale and bid a higher amount in an effort to protect his interest.